COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS



|  |  |
|---|---|
| § | No. 08-17-00048-CV |
| § |  |
| IN THE INTEREST OF A.L., § | Appeal from |
| § |  |
| A CHILD. § | 109th District Court |
| § |  |
| § | of Winkler County, Texas |
| § |  |
| § | (TC # DC15-16819) |
| § |  |

## **O P I N I O N**

This appeal is from a judgment terminating the parental rights of H.L. to her daughter. We affirm.

### **FACTUAL SUMMARY**

A.L. was three years of age at the time of the trial before the associate judge in December 2016. In August 2015, H.L. and A.L. were living in the home of H.L.'s parents. H.L.'s mother had suffered a stroke and required in-home health care to assist her with all activities of daily living.

The Texas Department of Family and Protective Services (the Department) first became involved with H.L. and A.L. in August 22, 2015 after receiving an intake report that the home was unclean and A.L. often did not wear any clothing. The Department required H.L. to clean the home and referred her to the Stay Together program so that she could receive additional in-home

parenting. The Department closed the investigation in October 2015, but it received another intake on December 3, 2015 regarding the unsanitary conditions of the home. When the investigator, Carla Davis, returned to the home, she found that its condition had worsened.

Seven dogs were in the home and Davis found dog feces in the living room, the child's bedroom, and another room. The furniture in the living room was covered in dog hair and dirty dishes were on the floor. At the time of Davis's visit, H.L.'s mother was on a recliner in the living room because she had broken her ankle. Davis testified that several "medical cords" were strung across the floor and A.L. had access to them.[1]

H.L. denied Davis access to the kitchen stating that the dogs in the kitchen would bite her. Davis could look into the kitchen, however, and she saw that the dogs were confined in cages. The dogs had been in the cages so long that they had urinated and defecated on the kitchen floor. There was a large pile of unwashed dishes in the sink and on the kitchen counter, and insects were crawling on the dishes. Davis also observed that a bowl of cereal had spilled onto the kitchen floor and had dried there. The kitchen table was covered with empty food containers, utensils, and bottles of medication.

In A.L.'s bedroom, Davis saw several piles of feces on the floor. The mattress did not have any sheets on it and there were brown smears on the mattress that appeared to be feces. Several fly strips were hanging from the ceiling and covered in flies. Davis also observed that A.L., who had just turned two and was not potty-trained, was wearing only a red t-shirt. H.L. refused Davis's request to take photographs of the house. The Department found reason to believe that H.L. had neglected A.L. and it removed her from the home on December 3, 2015.

---

[1] The nature of these cords (e.g., IV tubes or electrical cords to medical equipment) is unclear in the record.

Joy Welch Miller is a conservatorship caseworker assigned to the case. Since cleanliness of the home was an issue, Miller or another caseworker went to the home monthly to examine its condition. H.L. initially had seven dogs and Miller continued to find both dog urine and feces and on the floor of the home during her visits. The number of dogs was eventually reduced to three, but Miller continued to find both what appeared to be urine on the floors of the home. The bathrooms in the home were dirty and Miller frequently found unflushed waste in the toilet bowls. Miller made a home visit on October 26, 2016, approximately five weeks before the termination hearing, and she found H.L.'s bedroom in a state of disarray. The floor was covered with clothing, dishes, leftover food, and trash. H.L. was also using a circulating fan which did not have a cover on it.

Following the removal of A.L. from the home, H.L. or her father took steps to have repairs done to the home. For example, new laminate flooring was installed in some of the rooms and the hardwood floors were refinished in other areas. A.L.'s room was painted. Miller gave H.L. instructions on how to clean the house and provided demonstrations for her, but H.L. did not retain the knowledge from month to month or apply it consistently. H.L. was also resistant to cleaning the home and made excuses for not cleaning it, telling Miller that her father would not permit her to clean the house the way Miller had shown her. In addition to the unsanitary condition of the home, Miller was also concerned that dangerous objects, such as knives and saws, were often left within reach of a small child. Miller saw an improvement, however, with the roach infestation after a pest control company began treating the home. Despite the improvement in some areas of the home, it was Miller's opinion that the condition of the home endangered A.L.'s physical and emotional well-being.

Chelsea Reinhard is a conservatorship case worker and she has been in the home on seven different occasions. On November 8, 2016, approximately three weeks before trial, Reinhard made an unannounced visit to the home to check on its condition. H.L. had just gotten out of the shower and she invited Reinhard to talk in her bedroom while her mother's caregiver fixed her hair. Reinhard described H.L.'s bedroom as being in a state of "vast disarray." Clothes, partially eaten food, empty food containers, cigarette butts, and soda cans were on the floor. A trash bag was on the floor near an overflowing trash can. A used tampon was on the floor near the opening of the trash bag. Reinhard also observed a bong and a package of partially-used suppositories in the room. A small refrigerator was in the bedroom, and it had knives and pill bottles on top of it. H.L. explained that her aunt and three cousins had visited her over the weekend and had "trashed" the room, but she had been cleaning it since the previous day. Despite the bedroom's condition, H.L. described herself as a "clean freak" during this conversation with Reinhard. In her previous visits, Reinhard had explained to H.L. the dangerous conditions around the home for a child A.L.'s age. When Reinhard asked H.L. if she could identify any safety concerns in the bedroom, H.L. stated she could not see anything because she did not have on her glasses, but she indicated that the pile of extension cords, empty soda cans, and cases of beer could pose a danger to a child. The caregiver pointed out the bottles of prescription medication and the knives. Reinhard testified that whenever she spoke to H.L. about the condition of the home, she either denied the condition or made excuses as in this instance.

A.L.'s room was "fairly clean" and in the best condition Reinhard had seen it. The bed had a new mattress on it, but no sheets. Reinhard also went into the kitchen and characterized it as "vastly improved." The kitchen table was covered with dishes and utensils, but there were no dirty dishes in the sink or on the counter. Even though Reinhard had seen some improvement in

the condition of the home, she testified that the home was still not a safe environment for an active three-year-old.

Miller discussed with H.L. her mental health issues. H.L. told Miller that she has been diagnosed with bipolar disorder, depression, and anxiety, but she is not taking the medications prescribed through MHMR because she did not see any benefit and two of the medications made her sleepy. H.L. testified that she has been diagnosed with ADHD, OCD (obsessive compulsive disorder), bipolar, and manic depression. She has been going to MHMR since she was five years of age and she has "grown out of" her ADHD. According to H.L., her doctor took her off of Zoloft in August 2016 after she reported that it was making her sleepy. During the August 2016 visit, the doctor asked H.L. how she was controlling her mental health issues. When she told the doctor that she draws or paints when depressed, the doctor purportedly told her that she did not need medication. H.L. testified that she still has bipolar disorder, but she no longer has manic phases, and therefore, does not need medication for it.

Miller also had discussions with H.L. about her education. Initially, H.L. told her that she had graduated high school, but she later said that she had obtained her G.E.D. H.L. also claimed she was attending Arizona State University and was taking online courses at night to become a veterinarian. Miller's investigation revealed that Arizona State does not offer a veterinary program, and H.L. never provided any proof that she had graduated from high school or had a G.E.D. At trial, H.L. admitted that she dropped out of high school after tenth grade and she had not obtained a G.E.D. She thought she was taking online courses through Arizona State University, but it was one of those "rip off colleges," and she was going to turn her attention to getting her G.E.D.

The service plan required H.L. to complete parenting classes, individual counseling, and homemaking services, among other things. H.L. was required to repeat the parenting class because the instructor did not believe she understood the class or how to apply the information given to her. Since H.L. had reported that her father would not allow her to clean the home, H.L.'s parents were also required to take the parenting class with H.L. the second time she took it. H.L. subsequently completed another one-on-one parenting class. H.L. admitted that she did not understand the first two parenting classes.

Teresa Valero provided counseling services to H.L. The counseling sessions concerned the reasons for the child's removal from the home, and Valero discussed with H.L. the potential dangers of unsanitary conditions and unsafe objects left in reach of the child. H.L. reported to Valero that she had been neglected and physically abused as a child. Valero believed that H.L. understood what she was supposed to do, but she could not act consistently to improve the conditions of the home or break the generational pattern of living in unsanitary conditions. Valero testified that H.L. either denied that the home was unsanitary or she made excuses for the conditions. Valero also discussed with H.L. the proper care of A.L. and explained that it was necessary for her to be bathed every day. H.L. stated she did not know that. H.L. also claimed A.L. was dirty only because the Eucerin cream she was using on A.L.'s skin made dirt stick to her. H.L. told Valero that she did not put diapers on A.L. because a doctor had told her that diapers cause a blistering and bleeding rash.

The evidence showed that the caseworkers and Valero worked with H.L. to teach her how to clean the house and make it safe for A.L., but H.L. has been unable to consistently incorporate and apply what she learned. In Valero's opinion, H.L.'s unsanitary home is part of a generational pattern of living and she simply does not notice when her home is unclean because it is normal to

her. Valero explained that H.L. has been provided with counseling and parenting classes during the previous year, but it had made little difference in her parenting abilities. It is also Valero's opinion that H.L., due to her mental health issues, will not be able to consistently provide for A.L. and care for her, and the home will continue to be a dangerous environment for the child.

During H.L.'s testimony, her attorney asked her if she knew how she had gotten in this situation. H.L. explained that they moved into a house which was infested by roaches, she was attempting to care for her mother who required full-time assistance, and her parents had taken in too many dogs. Taking care of her mother, A.L., and the house proved to be too much for H.L. to handle. H.L. admitted that her home was not in a sanitary, or presentable condition from December 4, 2015 through October 2016, or on November 8, 2016 when Chelsea Reinhard made a home visit, but she claimed that she completely cleaned it the day A.L. was removed from the home, and she cleaned it the day before trial. She explained that the home was not in a presentable condition from December 2015 through October 2016 because it was in the process of being remodeled. H.L. disputed Miller's testimony about the dog feces being found on the floor, claiming it had happened only once, and she denied that Miller had shown her how to clean the home.

The trial court terminated H.L.'s parental rights to A.L., finding by clear and convincing evidence that H.L. had: (1) knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child (Section 161.001(b)(1)(D) of the Family Code); (2) engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child (Section 161.001(b)(1)(E) of the Family Code); and (3) termination of the parent-child relationship was in H.L.'s best interest. Additionally, the court found by clear and convincing

evidence that H.L. has a mental or emotional illness or a mental deficiency that renders her unable to provide the physical, emotional, and mental needs of the child, the illness or deficiency will, in all reasonable probability, continue to render H.L. unable to provide for the child's needs until the eighteenth birthday of the child, and the Department has been the temporary or permanent managing conservator of the child for the six months preceding the date of the termination hearing. *See* TEX.FAM.CODE ANN. § 161.003 (West Supp. 2016).

## TERMINATION GROUNDS AND BEST INTEREST
## UNDER SECTION 161.001

H.L. raises eight issues challenging the legal and factual sufficiency of the evidence supporting the trial court's findings. In Issues One through Six, H.L. attacks the legal and factual sufficiency of the evidence supporting the two predicate termination grounds found by the trial court under Section 161.001(1) and the best interest finding made under Section 161.001(2).[2] In Issues Seven and Eight, she challenges the evidentiary sufficiency of the trial court's findings made under Section 161.003.

A parent's rights may be involuntarily terminated through proceedings brought under Section 161.001 of the Texas Family Code. *See* TEX.FAM.CODE ANN. § 161.001 (West Supp. 2016). Under this provision, the petitioner must (1) establish one or more of the statutory acts or omissions enumerated as grounds for termination, and (2) prove that termination is in the best interest of the children. *See id*. Both elements must be established and termination may not be based solely on the best interest of the children as determined by the trier of fact. *Texas Department of Human Services v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *In the Interest of A.B.B.*, 482 S.W.3d 135, 138 (Tex.App.--El Paso 2015, pet. dism'd w.o.j.). Only one predicate

---

[2] The brief raises sufficiency issues related to the best interest finding in Issues One and Two. The opinion will first address the sufficiency challenges pertaining to the predicate termination grounds and then address the best interest finding.

finding under Section 161.001(1) is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest. *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003). We will affirm the termination order if the evidence is both legally and factually sufficient to support any alleged statutory ground the trial court relied upon in terminating the parental rights as well as the finding of best interest. *J.S. v. Texas Department of Family and Protective Services*, 511 S.W.3d 145, 159 (Tex.App.--El Paso 2014, no pet.).

*Standards of Review*

When reviewing the legal sufficiency of the evidence in a termination case, we consider all of the evidence in the light most favorable to the trial court's finding, "to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *In the Interest of J.P.B.,* 180 S.W.3d 570, 573 (Tex. 2005), *quoting In re J.F.C.,* 96 S.W.3d 256, 266 (Tex. 2002); *see In re J.O.A.,* 283 S.W.3d 336, 344 (Tex. 2009). We give deference to the fact finder's conclusions, indulge every reasonable inference from the evidence in favor of that finding, and presume the fact finder resolved any disputed facts in favor of its findings, so long as a reasonable fact finder could do so. *In the Interest of J.P.B.*, 180 S.W.3d at 573. We disregard any evidence that a reasonable fact finder could have disbelieved, or found to have been incredible, but we do not disregard undisputed facts. *In re J.P.B.*, 180 S.W.3d at 573; *In re J.F.C.*, 96 S.W.3d at 266.

In a factual sufficiency review, the inquiry is whether the evidence is such that a fact finder could reasonably form a firm belief or conviction about the challenge findings. *See In re J.F.C.*, 96 S.W.3d at 266. We must give due consideration to evidence that the fact finder could reasonably have found to be clear and convincing. *In re J.F.C.*, 96 S.W.3d at 266. A court of appeals should consider whether disputed evidence is such that a reasonable fact finder could not

have resolved that disputed evidence in favor of its finding. *Id.* If the disputed evidence that a reasonable fact finder could not have credited in favor of the finding is so significant that a fact finder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient. *Id.*

*Section 161.001(b)(1)(D)*

In Issues Three and Four, H.L. challenges the legal and factual sufficiency of the evidence supporting termination under Section 161.001(1)(D) of the Family Code. The trial court found by clear and convincing evidence that H.L. knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child. *See* TEX.FAM.CODE ANN. § 161.001(b)(1)(D). To "endanger" means to expose the child to loss or injury or to jeopardize a child's emotional or physical health. *Texas Department of Human Services v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *J.S. v. Texas Department of Family and Protective Services*, 511 S.W.3d 145, 159 (Tex.App.--El Paso 2014, no pet.). A child is endangered when the environment creates a potential for danger that the parent is aware of but consciously disregards. *J.S.*, 511 S.W.3d at 159; *Castaneda v. Texas Department of Protective and Regulatory Services*, 148 S.W.3d 509, 521-22 (Tex.App.--El Paso 2004, pet. denied). Endanger means more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment, but it is not necessary that the conduct be directed at the child or that the child suffer injury. *Castaneda*, 148 S.W.3d at 522.

We will begin by considering the legal sufficiency of the evidence supporting the finding under Section 161.001(b)(1)(D). The evidence, when considered in the light most favorable to the finding, shows that A.L. was living in extremely unsanitary conditions at the time she was removed from the home. Dog feces and urine were found on the floors throughout the home, including the

kitchen and the child's bedroom, and insects were seen crawling on the dirty dishes stacked in the sink and on the kitchen counter. A caseworker saw brown smears on the mattress in A.L.'s bedroom and she believed the substance to be feces. Further, the toilets were often not flushed. The caseworkers gave H.L. instructions on how to clean the home, but she did not consistently apply what she had learned and often denied that the home was unclean or made excuses for not cleaning. The caseworkers made visits to the home in October and November 2016, just a few weeks before the termination hearing. While improvement was seen in some areas of the home, including A.L.'s bedroom, H.L.'s bedroom was cluttered on both visits with clothes, leftover food, and trash found on the floor. The caseworkers identified objects which presented a potential danger to A.L. during both visits. In the October 2016 visit, Miller saw a circulating fan which had no cover in H.L.'s bedroom and she found knives and a saw on the floor of the home. In the November 2016 visit, Reinhard found knives and prescription bottles on top of a small refrigerator in H.L.'s bedroom. When this evidence is viewed in the light most favorable to the finding, it is sufficient to permit a reasonable fact finder to form a firm belief or conviction that H.L. knowingly placed or knowingly allowed A.L. to remain in conditions or surroundings which endanger her physical or emotional well-being. *See In re M.C., D.C., and C.W.*, 917 S.W.2d 268, 270 (Tex. 1996)(finding evidence sufficient to support a finding under Section 161.001(1)(D) where mother allowed children to live in extraordinarily unsanitary conditions); *In re P.E.W.*, 105 S.W.3d 771, 777-778 (Tex.App.--Amarillo 2003, no pet.)(finding evidence sufficient to support a finding under Section 161.001(1)(D) where children lived in unsanitary and filthy conditions with roaches crawling on the dishes and throughout the house, dirty dishes sitting in a water-filled sink, food on the floor, the toilet did not work and remained unflushed, and trash and other objects were found on the floor).

We will next consider whether the trial court's finding under Section 161.001(1)(D) is supported by factually sufficient evidence. The record reflects that H.L. made efforts to address some of the problems which caused the removal of A.L. from the home. She hired exterminators to address the roach infestation, several of the dogs were removed from the home, and the flooring was replaced. Despite H.L.'s claim that she had become a "clean freak", the home continued to be unsanitary and unsafe. Both Miller and Reinhard made home visits in the weeks before the termination hearing, and H.L.'s bedroom and the bathrooms were unsanitary. The toilets were unflushed as they had been during prior visits. The caseworkers found objects around the home, including knives and prescription bottles, which present a danger to a small child. Reinhard testified that when she visited the home in November 2016, A.L.'s bedroom was in the best condition it had been in since she had been involved in the case. She added, however, that the home was still not appropriate or sufficiently safe for A.L. to be returned. We conclude that the evidence is factually sufficient to support the trial court's finding that H.L. knowingly allowed A.L. to remain in conditions or surroundings which endanger her physical well-being. *See In re P.E.W.*, 105 S.W.3d at 777-778. Issues Three and Four are overruled.

*Best Interest - Legal Sufficiency*

In Issues One and Two, H.L. challenges the legal and factual sufficiency of the evidence supporting the best interest finding made under Section 161.001(2) of the Family Code. A determination of best interest necessitates a focus on the child, not the parent. *See In the Interest of B.C.S.*, 479 S.W.3d 918, 927 (Tex.App.--El Paso 2015, no pet.); *In the Interest of R.F.*, 115 S.W.3d 804, 812 (Tex.App.--Dallas 2003, no pet.). There is a strong presumption that it is in the child's best interest to preserve the parent-child relationship. *In re B.C.S.*, 479 S.W.3d at 927. The Texas Supreme Court has enumerated certain factors which should be considered: the child's

desires; the child's emotional and physical needs now and in the future; the emotional and physical danger to the child now and in the future; the parenting abilities of the individuals seeking custody; the programs available to assist those individuals to promote the child's best interest; the plans for the child by those individuals or the agency seeking custody; the stability of the home or proposed placement; the parent's acts or omissions that may indicate that the existing parent-child relationship is not a proper one; and any excuse for the parent's acts or omissions. *Holley v. Adams*, 544 S.W.2d 367, 372 (Tex. 1976)("the *Holley* factors"). We also must bear in mind that permanence is of paramount importance in considering a child's present and future needs. *In re B.C.S.*, 479 S.W.3d at 927.

We begin by examining the legal sufficiency of the evidence supporting the best interest finding. The first factor is the desires of the child. A.L. was only three years of age at the time of the termination hearing and there is no evidence indicating that she had the ability to articulate her wishes. The evidence showed that A.L. was living in foster care and had been in the same home since her removal. A.L. is thriving and is at the appropriate developmental level. She is also bonded to her foster parents. There is also evidence that H.L. visited A.L. regularly following the child's removal, but Miller observed that A.L. did not exhibit an emotional attachment to her mother during these visits. The evidence related to this factor weighs in favor of the trial court's best interest finding. *See In re U.P.,* 105 S.W.3d 222, 230 (Tex.App.--Houston [14th Dist.] 2003, pet. denied).

The next two factors are the child's emotional and physical needs now and in the future, and the emotional and physical danger to the child now and in the future. The need for permanence is a paramount consideration for a child's present and future physical and emotional needs. *Edwards v. Texas Department of Protective & Regulatory Services*, 946 S.W.2d 130, 138

(Tex.App.--El Paso 1997, no pet.), *disapproved of on other grounds by In re J.F.C.*, 96 S.W.3d 256 (Tex. 2002); *In re U.P.,* 105 S.W.3d at 230 (stating that children need permanency and security). A fact finder may infer that past conduct endangering the well-being of a child may recur in the future if the child is returned to the parent. *In the Interest of D.L.N.*, 958 S.W.2d 934, 934 (Tex.App.--Waco 1997, pet. denied).

The Department removed A.L. from the home due to neglect and because of the home's unsanitary and unsafe conditions. The evidence demonstrated that the home was extraordinarily unsanitary with dog feces and urine found on the floors throughout the home. The home was also cluttered with clothing, trash, and leftover food. H.L.'s counselor, Theresa Valero, testified that H.L. is unable to recognize that the home is unsanitary due to a generational pattern of living in an unsanitary home. Even though H.L. made some improvements to the home and addressed some of the issues which caused A.L. to be removed, including the roach infestation, the condition of the home continued to present a danger to A.L.'s physical well-being. H.L. claimed that she was keeping the home clean, but the caseworkers' observations of the home made just a few weeks before the termination hearing directly contradicted that testimony. H.L. often disputed that the unsanitary conditions existed and she failed to recognize and remove dangerous conditions, such as prescription bottles and knives left within the reach of a small child. At trial, H.L. disputed the caseworkers' testimony that the toilets were typically unflushed, but the photos taken during Reinhard's November 8, 2016 visit support the caseworkers' testimony. There is evidence in the record from which the trial court could find that the condition of the home would continue to present a danger to A.L. in the future. We conclude that the second and third factors weigh heavily in support of the best interest finding.

The fourth factor is the parenting abilities of the individuals seeking custody. In reviewing the parenting abilities of a parent, a fact finder can consider the parent's past neglect or past inability to meet the physical and emotional needs of the children. *D.O. v. Texas Department of Human Services*, 851 S.W.2d 351, 356 (Tex.App.--Austin 1993, no writ), *disapproved of on other grounds by In re J.F.C.,* 96 S.W.3d 256 (Tex. 2002). As set forth in our discussion of the second and third factors, there is considerable evidence that H.L. has demonstrated an inability to meet A.L.'s physical needs by cleaning the home and removing objects and conditions which make it unsafe for a small child. Each of the witnesses who worked with H.L. testified that she either denied that the unsanitary or unsafe conditions existed or she made excuses for not addressing the conditions. The evidence related to this factor supports the best interest finding.

The fifth factor examines the programs available to assist those individuals to promote the child's best interest. H.L. attended the parenting classes as required, but the evidence showed that it did not make a significant difference in her parenting abilities. The caseworkers also instructed H.L. on how to clean the home, but she had difficulty retaining what she had been taught and did not consistently apply it. Further, H.L. often denied that the home was unsanitary or made excuses for not cleaning it. H.L. attended some counseling sessions but refused to attend additional sessions because it was not court-ordered. The fact finder can infer from a parent's failure to take the initiative to utilize the available programs that the parent did not have the ability to motivate herself in the future. *In re W.E.C.*, 110 S.W.3d 231, 245 (Tex.App.--Fort Worth 2003, no pet.). This factor supports the court's best interest finding.

We will consider the sixth and seventh factors together. The sixth factor examines the plans for the child by those individuals or the agency seeking custody. The seventh factor is the stability of the home or proposed placement. The fact finder may compare the parent's and the

Department's plans for the child and determine whether the plans and expectations of each party are realistic or weak and ill-defined. *D.O.*, 851 S.W.2d at 356. The Department's plan is for A.L. to remain in her current placement where she is thriving, and her needs are being met. H.L. asked the court to deny the petition and return A.L. to her, or alternatively, to order a monitored return so that she could demonstrate her ability to maintain a clean home and provide a safe environment for the child. There is evidence that H.L.'s home is unstable. H.L.'s father is sixty-four years of age and receives social security benefits. H.L. is dependent on him for financial support. H.L.'s mother is fifty-four years of age and receives social security disability. Her mother requires assistance with all activities of daily living. H.L. is her primary caregiver, but there is a provider who cares for her mother four days each week. H.L. was unemployed at the time of trial and she does not have a driver's license. H.L. planned to find a job in Eunice and have one of her friends watch A.L. while she worked. The counselor, Theresa Valero, was concerned with H.L.'s lack of financial stability and feared that she would not be able to provide for A.L. if something happened to her parents. Based on the foregoing evidence, the trial court could have found that H.L.'s plans for A.L. are unrealistic.

The eighth factor is the parent's acts or omissions that may indicate that the existing parent-child relationship is not a proper one. The evidence shows that H.L. permitted A.L. to live in an extremely unsanitary and unsafe home. While H.L. took steps to correct some issues in the home after A.L. was removed, the caseworkers who visited the home within the weeks before the termination hearing found that areas of the home continued to be unsanitary and dangerous for a small child. H.L. frequently denied that the conditions existed or she made excuses for the conditions. The evidence supports a conclusion that H.L. is unable to meet A.L.'s physical needs.

The ninth factor is whether there is any excuse for the parent's acts or omissions. There is evidence that the condition of the home may be the result of a generational pattern of living in an unsanitary home, and while H.L. made some changes, she was unable to break the pattern. There is also evidence that H.L.'s mental health issues may have prevented her from consistently applying what she had learned in order to provide and safe and clean environment for her child. This factor is neutral or weighs slightly against the best interest finding.

Having reviewed all of the *Holley* factors, we conclude that the evidence is legally sufficient to establish a firm conviction in the mind of the trial court that termination of H.L.'s parental rights is in the child's best interest. Issue One is overruled.

*Best Interest - Factual Sufficiency*

We turn now to the factual sufficiency of the evidence supporting the best interest finding. There is contrary or disputed evidence relative to some of the *Holley* factors. The caseworkers did not doubt that H.L. loved her daughter, but there is evidence that A.L. does not have a strong emotional attachment to her. H.L. took steps to rid the home of the roach infestation, she had the flooring replaced, and she convinced her parents to remove some of the dogs from the home. H.L. also insisted in her testimony that the home was now clean. Despite these improvements, the caseworkers who visited the home just a few weeks before the termination hearing found that the home remained in an unsanitary and unsafe condition. H.L. also attended the parenting classes and counseling, but the caseworkers and her counselor agreed that it did not significantly improve her parenting abilities. H.L. denied that that the caseworkers gave her any instructions on how to clean the home, but she contradicted herself by testifying that she was following the instructions she had been given. We conclude that the evidence is factually sufficient to support the trial court's determination that termination of H.L.'s parental rights is in the child's best interest. Issue Two is

overruled. Because we have found the evidence legally and factually sufficient to support one of the statutory termination grounds and the best interest finding, it is unnecessary to address Issues Five, Six, Seven, and Eight. The order terminating H.L.'s parental rights to A.L. is affirmed.

July 31, 2017

ANN CRAWFORD McCLURE, Chief Justice

Before McClure, C.J., Rodriguez, and Palafox, JJ.