# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

### NO. 03-19-00395-CV

---

**D. L.-B., Appellant**

**v.**

**T. D. and J. D., Appellees**

---

**FROM THE 22ND DISTRICT COURT OF CALDWELL COUNTY**
**NO. 18-A-471, THE HONORABLE CHRIS SCHNEIDER, JUDGE PRESIDING**

---

## M E M O R A N D U M   O P I N I O N

Appellant D.L.-B. ("the mother") appeals from the district court's order terminating the mother's parental rights to her children, A.M.-E. and V.B.B. ("the children"). In a single issue on appeal, the mother asserts that there is legally and factually insufficient evidence to prove that termination of her parental rights is in the best interest of the children. We will affirm the district court's order.

## BACKGROUND

The children, two girls ages seven and four at the time of trial, were first removed from the mother in 2014, when the Texas Department of Family and Protective Services ("the Department") received a report that the mother had injured one of the children. The children were placed in the temporary care of appellees T.D. and J.D., who would later become the

children's foster parents. In 2015, the children were returned to the mother. However, in 2016, following allegations that one of the children had a black eye, the children were again removed from the mother and returned to the foster parents. The children subsequently went back and forth between the mother and the foster parents on multiple occasions, and the foster parents, who wanted to adopt the children, grew increasingly frustrated with the situation.

In October 2018, the foster parents filed suit for termination of the mother's parental rights. The case proceeded to a bench trial. The district court heard from multiple witnesses at trial, including Tammy Axelson, a court-appointed child-custody evaluator; Tahlia Stewart, the guardian ad litem for the children; Dr. Tina Nunnellee, a licensed professional counselor; the foster mother; the mother; and M.B., the mother's husband. The district court also considered documentary evidence, including a detailed child-custody evaluation prepared by Axelson. We discuss the evidence presented at trial in more detail below.

At the conclusion of trial, the district court found by clear and convincing evidence that the mother (1) knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endanger the physical or emotional well-being of the children and (2) had her parent-child relationship terminated with respect to another child based on a finding that her conduct was in violation of Paragraph (D) or (E) of section 161.001(b)(1) of the Texas Family Code. *See* Tex. Fam. Code § 161.001(b)(1)(D), (M). The district court also found that termination of the parent-child relationship between D.L.-B. and the children was in the best interest of the children. *See id.* § 161.001(b)(2). This appeal followed.

2

## STANDARD OF REVIEW

The district court may order termination of the parent-child relationship "if clear and convincing evidence supports that a parent engaged in one or more of the [statutorily] enumerated grounds for termination and that termination is in the best interest of the child." *In re N.G.*, 577 S.W.3d 230, 232 (Tex. 2019) (per curiam) (citing Tex. Fam. Code § 161.001(b)). "Proceedings to terminate the parent-child relationship implicate rights of constitutional magnitude that qualify for heightened judicial protection." *In re A.C.*, 560 S.W.3d 624, 626 (Tex. 2018). "Because termination of parental rights 'is complete, final, irrevocable and divests for all time' the natural and legal rights between parent and child, a court cannot involuntarily sever that relationship absent evidence sufficient to 'produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established.'" *Id*. at 630 (quoting Tex. Fam. Code § 101.007; *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985)).

"The distinction between legal and factual sufficiency lies in the extent to which disputed evidence contrary to a finding may be considered." *Id*. "Evidence is legally sufficient if, viewing all the evidence in the light most favorable to the fact-finding and considering undisputed contrary evidence, a reasonable factfinder could form a firm belief or conviction that the finding was true." *Id*. at 631. "Factual sufficiency, in comparison, requires weighing disputed evidence contrary to the finding against all the evidence favoring the finding." *Id*. "In a factual-sufficiency review, the appellate court must consider whether disputed evidence is such that a reasonable factfinder could not have resolved it in favor of the finding." *Id*. "Evidence is factually insufficient if, in light of the entire record, the disputed evidence a

3

reasonable factfinder could not have credited in favor of a finding is so significant that the factfinder could not have formed a firm belief or conviction that the finding was true." *Id*.

## ANALYSIS

Because the mother does not challenge the sufficiency of the evidence supporting the statutory grounds for termination, we focus our analysis on the district court's finding that termination was in the best interest of the children. The best-interest prong of the termination statute "is child-centered and focuses on the child's well-being, safety, and development." *Id*. "A best-interest determination is thus guided by several non-exclusive factors, including: (1) the child's emotional and physical needs; (2) the emotional and physical danger to the child now and in the future; (3) the parental abilities of the individuals seeking custody; (4) the plans for the child by those individuals and the stability of the home; (5) the plans for the child by the agency seeking custody and the stability of the proposed placement; (6) the parent's acts or omissions that may indicate the existing parent-child relationship is improper; and (7) any excuse for the parent's acts or omissions." *Id*. (citing *Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976)); *see also In re E.N.C.*, 384 S.W.3d 796, 807 (Tex. 2012); *In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002). "The absence of evidence about some of these considerations would not preclude a factfinder from reasonably forming a strong conviction or belief that termination is in the child's best interest," *C.H.*, 89 S.W.3d at 27, but the best-interest finding "must be supported by clear and convincing evidence in the record," *E.N.C.*, 384 S.W.3d at 808.

**The mother's acts or omissions that indicate an improper parent-child relationship**

The mother has an extensive history with the Department. In 2003, the mother's parental rights to her first child were terminated after the trial court found by clear and convincing evidence that she had engaged in conduct that endangered the physical or emotional well-being of the child. Shortly thereafter, the mother lost her parental rights to a second child after that child was born prematurely due to the mother's use of crack cocaine.[1] In 2011 and 2014, the mother gave birth to her third and fourth children, the children subject to this suit, and the Department investigated the mother for physically abusing and neglecting those children. In 2017, the mother gave birth to her fifth child and, in early 2019, her parental rights to that child were terminated after the child tested positive for a potentially "lethal dose" of cocaine in her system.[2]

The mother acknowledged that she had used cocaine on six separate dates in June 2018, although she denied that her drug use had endangered the life of the child who had tested positive for cocaine. The mother claimed that the child had been exposed to cocaine by another person who was living in her household at the time, Priscilla Middlebrook. The mother testified that Middlebrook was an "ex-heroin addict" whom she had met while serving time in the Caldwell County Jail, and the mother invited Middlebrook to live with her, her husband, and the children after she got out of jail. The mother claimed that Middlebrook used marijuana and

---

[1] The record does not include much evidence relating to the termination of the mother's parental rights to her first two children. However, the mother admitted in her testimony that she had been using crack cocaine when her second child was born, and Tammy Axelson testified that at the time the children had been removed, there had been "multiple allegations" against the mother of drug use and neglectful supervision.

[2] This Court affirmed the termination of the mother's parental rights to that child. *See D. L. E. B. v. Texas Dep't of Family & Protective Servs.*, No. 03-19-00186-CV, 2019 Tex. App. LEXIS 6834 (Tex. App.—Austin Aug. 8, 2019, pet. denied) (mem. op.).

cocaine while she was living with them and that Middlebrook had exposed the youngest child to cocaine when the mother had allowed Middlebrook to take care of the child. When confronted with evidence that the child's exposure to cocaine had instead occurred when the mother was breastfeeding her, the mother denied it and claimed that at the time she was using cocaine, she had stopped breastfeeding the child.

The mother had a history of lying. She had told her husband, M.B., that he was the father of the children subject to this suit, and she had repeated that claim under oath at a prior court hearing. However, subsequent DNA testing revealed that M.B. was not the father of the children. The mother admitted that she had perjured herself on that matter. The mother had also made false reports that the foster family had engaged in criminal activity, including a claim that the two sons of the foster parents had sexually abused the children. Child Protective Services had investigated this and other claims and had "ruled out" the mother's allegations, having found no evidence to substantiate her claims. Tahlia Stewart, the guardian ad litem for the children, testified that in her experience, the mother had lied regularly on matters relating to the children, and the mother's husband acknowledged that she is "not good about telling the truth." The mother had also lied to investigators about Middlebrook, the drug user who was living in her home, at first claiming that Middlebrook was only visiting them for a weekend before admitting that Middlebrook had lived with them on an extended basis.

The district court also heard evidence that the mother had neglected and failed to supervise the children. Stewart testified that the mother "wouldn't pay attention to the children" and would allow them to walk in and out of the house unsupervised, which concerned Stewart because there was an above-ground swimming pool in the backyard that was a safety hazard for the children. Stewart believed that "the main issue" with the mother was her "neglectful

6

behavior" toward the children and "the mental abuse that she inflicts on them," which, Stewart opined, "makes them aggressive, makes them act out and makes them a danger" to each other.

**The children's emotional and physical needs and danger to the children**

Dr. Tina Nunnellee, a licensed professional counselor who provided parenting services to the mother, testified that due to the mother's neglect, the children were "starved for love," which resulted in the older child in this suit having serious behavioral issues. Specifically, the older child had killed a pet rabbit, possibly killed other family pets, and had attempted to drown her younger sister in a swimming pool, which Nunnellee described as "a serious effort to take the life of her sister." This behavior indicated to Nunnellee that "this child has experienced extreme emotional trauma, has probably seen some violence that the child thinks is okay," and "may be on the road to developing serious psychopathy." Thus, in Nunnellee's opinion, the older child needed immediate professional intervention and therapy. Evidence was also presented that the younger child, although not suffering from the same behavioral issues as the older child, was "significantly delayed" "verbally, socially, [and] behaviorally" and was at risk of physical harm and possibly death from her sister.

**The mother's parental abilities, plans for the children, and stability of her home**

Nunnellee did not have "any confidence at all" that the mother would be able to address the children's emotional and physical needs. Nunnellee had provided the mother with parent training, individual therapy, and couples therapy, but "none of it was what [she] would consider to be sufficiently successful." Also, Stewart testified that the mother and her husband were not supportive of the therapy that the older child was receiving and "didn't seem to

7

understand . . . the severity of the situation or the behavior issues that [the older child] was going through."

Tammy Axelson, the court-appointed child-custody evaluator, testified that during the mother's supervised visits with the children, the mother had "inappropriate conversations with the children about the case," causing them "to become more emotionally upset than they should have" been. Also, toward the end of the visits, the mother appeared to "checkout" and "become exhausted," making excuses for the visits to end early. However, Axelson also testified that during one supervised visit, the mother and the children "did a puzzle together" and the children were happy and excited to see both the mother and her husband.

In Axelson's child-custody evaluation, she wrote that the mother had acknowledged that "she is not in good health." She had asthma and "broke all the bones on the right side of her body in 2011 as a result of an auto accident." She also suffered from bipolar disorder, depression, and insomnia. The mother admitted that she had prior arrests for drug charges, prostitution, aggravated assault, and injury to a child, although she stated that she had not been arrested in "several years."

The district court also heard evidence concerning the mother's living situation. The mother, who was 36 years old at the time of trial, lived with her husband, M.B., who was 84 years old. M.B. claimed to be in "fair health," although he had diabetes, diverticulitis, and heart disease and had suffered a heart attack in 2016. M.B. admitted to having been arrested on what he estimated to be "over fifty" different occasions, mostly for gambling but also for driving while intoxicated, not paying his income taxes, and shooting a person. M.B. met the mother in 2011, when she was working as a prostitute. M.B. "offered to marry her in order to prevent her

8

from having to keep prostituting herself" to support her drug habit. M.B. also admitted to supplying the mother with drugs when they first married but claimed that "she is now clean."

The home in which the mother and M.B. lived was described by witnesses at trial as "dirty," "disgusting," and "infested with fleas." The younger child had been observed with "numerous flea bites during [the] case." Dr. Nunnellee testified that she herself had been "bitten by fleas, chiggers, and mosquitos while being there," and described the smell in the house as "atrocious." Nunnellee observed that there were cans of paint and other chemicals "stored on the floor," that the kitchen sink could not be seen "because of what was piled on there," and that "the garbage was not taken out on any reasonable basis." Nunnellee did not believe that the home was safe for children. Stewart described the home similarly, characterizing it as "cluttered," not "baby proofed at all," and having "a lot of hazards for a very small child." M.B. also agreed that their home was not "a safe place for children to be."

When asked to describe her plans for caring for the children, the mother testified that she was "going to seek some services out" and "do everything in [her] power to get back on [her] feet." She wanted to raise the children with her husband in a different city, receive drug counseling, and take anger management classes.

Axelson, however, was skeptical that the mother could change her behavior. She explained, "Based on the history and the pattern of behaviors from the mother, my concern was [] that typically that pattern showed that there hadn't been any significant change from the original time she had children, I believe, back in 2003 [when the mother's first two children] were removed. My concerns were the patterns were going to continue. That the mother needed a significant amount of intervention and change in her life to be able to manage . . . these children." Stewart testified similarly that she believed the mother to be "an unfit mother in

9

general" who had endangered the children's well-being in the past and would continue to endanger and neglect the children in the future.

**The foster parents' parental abilities, plans for the children, and stability of their home**

Axelson described the foster parents as having a "stable life." They were both in their late thirties and had been married for 17 years. They owned several businesses, enjoyed "flexible hours" at work, and had "lived in their home for a long time." The foster father had one arrest for carrying a firearm into a state that did not have concealed-carry reciprocity with Texas. However, that charge was dismissed, and the foster parents had no other criminal history.

The foster parents had two biological children, boys who were 15 and 12 years old at the time of trial. Axelson described the boys as "very well-mannered young men" and "really good kids." She added that "there's a very strong sibling bond that's already developed" between the boys and the girls, with "very normal secure attachments between each family member." Axelson had "no concerns" regarding the foster parents' home environment, and Stewart described it as "a good home."

The foster parents had placed both children in therapy and enrolled the older child in gymnastics and other extracurricular activities to improve her social skills. Axelson testified that she had recently interacted with the children and that they "looked amazing." She was "very pleased and just really surprised at the changes that [she] observed in the children." The younger child had "significant development in her verbal skills" and was outgoing, friendly, and inquisitive. The older child "did not have the appearance of any anxiety," engaged in conversation with Axelson "really easily," and "seemed to be doing really well at school." Additionally, the older child and the younger child now "played really well together."

10

Stewart testified similarly that the older child is no longer "aggressive toward" her younger sister, is "able to interact with animals . . . in a positive way," and "is able to play with children younger and older than her in a normal fashion, not in an aggressive fashion." Stewart described the difference between the children's behavior in their mother's household and the foster parents' household as "almost like a light switch or a night and day."

In addition to having custody of the children subject to this suit, the foster parents also had custody of the children's younger sister, the child subject to the last suit for termination of the mother's parental rights.[3] Axelson testified that having the three siblings living together in the same home was a beneficial situation for the children.

The foster mother testified that she and her husband planned to adopt all three siblings. She also testified that they "would continue with services as needed, counseling and otherwise," make the children's education "the priority" in their lives, and "just try to raise them to be good people." The foster mother added that she and her husband have a "huge extended family" whose members "offer plenty of support" and "love all the children and spend as much time as they can with them."

**Conclusions regarding sufficiency**

In summary, the district court heard evidence that:

- The mother used cocaine repeatedly in June 2018 and had a history of using crack cocaine prior to that.

---

[3] *See D.L.E.B.*, 2019 Tex. App. LEXIS 6834, at *1–4 & n.1.

- As a result of either the mother's cocaine use or the cocaine use of the person who lived with her, one of her children had tested positive for a potentially "lethal dose" of cocaine.

- The mother's parental rights to that child had been terminated, and her parental rights to two other children had been terminated following similar allegations of drug use.

- The mother had a history of lying about important matters related to the children's well-being, including the identity of the children's father, the behavior of the children's foster family, and the fact that the mother had allowed a drug user to live with the children.

- The mother had neglected the children, and her neglect had caused the older child to become dangerously "aggressive" toward animals and her sister and had caused the younger child to be "significantly delayed" in her development and at risk of harm from her older sister.

- A licensed professional counselor did not have "any confidence at all" that the mother would be able to address the children's emotional and physical needs, despite the mother having received parent training and therapy.

- The mother and her husband were not supportive of the older child's need for therapy.

- The children had both positive and negative experiences during the mother's supervised visits.

- The mother and her husband were not in good health and had extensive criminal histories.

- The mother's home was described as "dirty," "disgusting," "infested with fleas," and unsafe for children.

- The mother expressed a desire to move, raise the children with her husband, and improve her life, but the professionals who testified did not believe that the mother could break her "pattern" of drug use and neglect.

- The foster parents had a "stable life," a "good home," and a loving and supportive extended family.

- The foster parents were providing the children with needed therapy and services and were prioritizing the children's education. As a result, the children's behavior and development had improved considerably while they were in the care of the foster parents.

- The children had bonded with their foster family, and the foster family had bonded with them.

- The foster parents planned to adopt both children and their younger sister, thus keeping the siblings together and the foster family intact.

Viewing the above evidence in the light most favorable to the district court's finding, we conclude that a reasonable factfinder could form "a firm belief or conviction" that termination of the mother's parental rights is in the best interest of the children. *See In re J.L.*, 163 S.W.3d 79, 87–88 (Tex. 2005); *J.F.C.*, 96 S.W.3d at 268–72; *see also In re A.L.*, 545 S.W.3d 138, 147–50 (Tex. App.—El Paso 2017, no pet.) ("The fact finder may compare the [parties'] plans for the child and determine whether the plans and expectations of each party are realistic or weak and ill-defined."); *In re E.R.W.*, 528 S.W.3d 251, 266 (Tex. App.—Houston [14th Dist.] 2017, no pet.) (explaining that "[a] parent's drug use supports a finding that termination is in the best interest of the child" and observing that "[t]he fact finder can give 'great weight' to the 'significant factor' of drug-related conduct"); *In re J.D.B.*, 435 S.W.3d 452, 468 (Tex. App.—Dallas 2014, no pet.) ("The need for stability and permanence are important considerations in determining a child's best interest."); *In re D.S.*, 333 S.W.3d 379, 384 (Tex. App.—Amarillo 2011, no pet.) ("A trier of fact may measure a parent's future conduct by his or her past conduct and determine that it is in the child's best interest to terminate parental rights.").

13

When considering the evidence contrary to the district court's finding, we reach the same conclusion regarding the factual sufficiency of the evidence. We cannot say that the evidence favorable to the mother is "so significant that the factfinder could not have formed a firm belief or conviction" that termination was appropriate here. *See A.C.*, 560 S.W.3d at 631–32; *C.H.*, 89 S.W.3d at 27–28.

## CONCLUSION

We overrule the mother's sole issue on appeal and affirm the district court's order of termination.

_____

Gisela D. Triana, Justice

Before Chief Justice Rose, Justices Triana and Smith

Affirmed

Filed: October 30, 2019