

## COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

### NO. 02-18-00107-CV

IN THE INTEREST OF L.W. AND
F.W., CHILDREN

----------

FROM THE 323RD DISTRICT COURT OF TARRANT COUNTY
TRIAL COURT NO. 323-106063-17

----------

### MEMORANDUM OPINION[1]

----------

Appellant K.W. (Father) appeals from the trial court's order terminating his parental rights to his children, L.W. (Luke) and F.W. (Faith).[2] In three issues, he argues that the evidence was factually insufficient to support the trial court's findings that his conduct satisfied the two alleged endangerment grounds or that

---

[1]*See* Tex. R. App. P. 47.4.

[2]We refer to the children and their family members by fictitious names. *See* Tex. Fam. Code Ann. § 109.002(d) (West Supp. 2017); Tex. R. App. P. 9.8(a)–(b).

termination of his parental rights was in the children's best interest. We conclude, after deferentially viewing the entire record in favor of the trial court's findings, that the evidence allowed it to reasonably form a firm belief or conviction that Father's conduct or inaction rose to the level of endangerment and that the children's best interest would be served by terminating his parental rights. Thus, we affirm the trial court's order of termination.

## I. BACKGROUND

In June 2007, Father and M.C. (Mother) had a son, Luke. In 2009, the Department of Family and Protective Services (DFPS) received a report that Father and Mother were subjecting Luke to neglectful supervision, which DFPS determined there was reason to believe happened. As a result, Luke was removed and placed with a relative. At some point, Luke was returned to Mother and Father, and the trio moved to Florida. In 2010, Mother and Father had a daughter, Faith. Shortly after Faith's birth and after the family moved back to Texas, DFPS received another neglectful-supervision report and a report of medical neglect. DFPS found reason to believe both reports—at four months old, Faith weighed eleven pounds. Both Luke and Faith were removed from the home and placed in foster care, and DFPS filed a petition to terminate Father's and Mother's parental rights.

On April 25, 2012, a trial court terminated Mother's parental rights to Luke and Faith based on Mother's unrevoked or irrevocable affidavit of voluntary relinquishment of her parental rights and on the court's finding that termination

2

was in the children's best interest.  *See* Tex. Fam. Code Ann. § 161.001(b)(1)(K), (b)(2) (West Supp. 2017).  Regarding Father, the trial court found by clear and convincing evidence that he endangered the children and failed to comply with the service plan but that termination of his parental rights was not in the children's best interest.  *See id.* § 161.001(b)(1)(D), (E), (O).  At that time, the trial court appointed DFPS as the children's permanent managing conservator.

In 2014, the children were returned to Father.  Shortly thereafter, Faith made an "allegation about [Luke] sticking a corn dog up her butt."  DFPS investigated but found no injuries to Faith; thus, DFPS "closed" the case.  In May and December 2015, DFPS investigated reports that the children frequently were left home alone, that Luke was hitting Faith, and that the children were "unkempt," "dirty," and covered in "bug bites and bruises (arms/legs/face)."  Although DFPS found reason to believe these reports, it closed the investigation after Father and the children "fled" to Tennessee.  While in Tennessee, there were allegations that Father was physically abusing Luke.  Additionally, Father was admitted to a psychiatric hospital in Tennessee for his bipolar disorder, and Faith and Luke stayed with an aunt.  The children were removed from the aunt's care after there were allegations that her son was sexually abusing Luke.

In October 2016 after Father moved back to Texas with the children, Faith told a teacher that "she had special time with dad that . . . [Luke] was not allowed to be in the room with."  This allegation was "clear[ed] up" after Faith explained "special time" was computer time with Father.  Also in October, DFPS

3

investigated after Luke had "a facial injury" he said was caused by Father "pick[ing] him up by his neck." Father admitting grabbing Luke by the neck but denied lifting him off the ground. DFPS noted that Father "was resistant to utilizing community resources." Two months later, DFPS received a report that the children were frequently left home alone and neglected. The investigation was closed because Father lost his job, eliminating the apparent cause of his leaving the children alone, and because Father had signed a safety plan representing that he would not leave the children alone. A similar report was received in February 2017 with a similar disposition—case closed because Father lost his job.

In October 2017, Faith's teacher contacted DFPS because Faith was frequently tired, dirty, hungry, and hurting when she arrived at school. Once Faith came to school with a black eye. The teacher also saw Luke be physically violent and "cruel" to Faith. Luke had behavioral problems at school, necessitating his placement in a special-education class and leading to his teacher rating him an eight out of ten for disruptiveness. Like Faith, Luke would come to school hungry, dirty, and bruised. He would fall asleep at school every day and sleep for between thirty minutes and an hour, disrupting his instructional time.

Kamisha Knight, an investigator with DFPS, investigated Faith's teacher's report of neglectful supervision and physical neglect. Knight was unable to reach Father after repeatedly trying to call him at multiple, different phone numbers.

4

After talking to Faith, Knight found reason to believe that Father was leaving Faith and Luke home alone and that Luke was hitting Faith. Charity Garcia, a forensic interviewer with an advocacy center, conducted a forensic interview of Faith on October 13, 2017. Faith told Garcia that Father put his penis "to her butthole," describing "penile penetration of her anus by [Father's] penis" that began when she was four years old and continued until she was six or seven years old. Father told Faith to keep it a secret. Faith also drew a picture during the interview, showing Faith in a bed saying, "No." She wrote under the picture: "[My dad] has sex wif me."

Knight observed Garcia's interview with Faith and took Faith to a hospital for a sexual-assault exam. Faith made the same outcry statements to the nurse during the exam.[3] Knight immediately took Faith to a foster home. *See id.* § 262.104 (West Supp. 2017). On October 16, 2017, DFPS filed a petition seeking the termination of Father's parental rights. *See id.* § 161.002(b) (West Supp. 2017). That same day, the trial court entered orders removing Faith and Luke from Father's custody and naming DFPS as their temporary sole managing conservator. In November 2017, the trial court found that Father had subjected the children to aggravated circumstances, warranting the waiver of a service plan and of making reasonable efforts to return the children to Father. *See id.* § 262.2015(a) (West Supp. 2017). Specifically, the trial court found that (1) Faith

---

[3]At the time of the termination trial, law enforcement was continuing to investigate Faith's sexual-abuse allegations.

or Luke was a victim of serious bodily injury or sexual abuse inflicted by Father and (2) Father had engaged in conduct that constituted the offenses of indecency with a child, sexual assault, aggravated sexual assault, abandoning or endangering a child, and continuous sexual abuse of a child or children. *See id.* § 262.2015(b)(2), (b)(3)(D), (E), (G), (I), (M).

Luke was placed in several foster homes, two of which lasted only thirty-six hours based on his behavior and resulted in his admissions to a psychiatric hospital. In December 2017, Luke was placed with the Atkins family. Faith was placed in a separate foster home from Luke and began seeing a counselor, Bryant Guidry, in December 2017.[4] Faith told Guidry about "extraordinary neglect and physical abuse" that occurred while she was with Father, including Father and Luke physically attacking her, Father choking her, going without food for days, and being bitten by rats in her home. Luke later denied that Father choked him or that he had been bitten by rats. Faith wanted to be reunited with Luke but not with Father.

At the March 19, 2018 trial, Father testified that many of the problems that were reported to DFPS and led to the removal of Faith and Luke were a direct result of his dire financial straits. He did not have the money to wash the children's clothes, he could not afford his psychiatric medications, the hotel he was living at did not have reliable phone service,[5] and he had no choice but to

---

[4]One of Luke's short-term placements was in the same home as Faith.

[5]Father explained that this was why Knight was unable to reach him.

occasionally leave the children alone while he sporadically worked. But he pointed out that he applied for the free-school-lunch program every year for the children, was on welfare, and was on a long waiting list for government housing. He denied the sexual- and physical-abuse allegations.

Luke's foster mother Betty Atkins testified that Luke had lived with her family since December 2017 and that she wanted to adopt Luke and Faith. Luke told her that he wants to stay with the Atkins family "forever" and calls Betty and her husband mom and dad. Luke began taking medication for his behavior, which had improved, and had better sleep patterns. Betty believed she could provide needed supervision for Luke and that it would be in both Luke's and Faith's best interest to be reunited in her home.

The children's DFPS caseworker Lauren Robinson testified that Faith's current foster placement was not interested in adoption but that she had improved since she had been removed from Father. Although Robinson had concerns about Faith being reunited with Luke, she would move Faith to an adoption-motivated home if the Atkins home did not work. Robinson believed the children's best interest would be served through stability and permanency, which Father could not provide, and that Father's parental rights should be terminated.

The children's attorney ad litem stated to the court that she agreed the termination of Father's parental rights would be in the children's best interest. DFPS summed up why it requested that Father's parental rights be terminated:

> Judge, this is not a case about [Father] being poor. This is a case about [Father's] poor judgment, extreme neglect, physical abuse of

his children, and now in this case, sexual abuse of [Faith], and it's gone on these children's entire lives. Back in 2010, 2014 case there was a[n] [endangerment] finding against [Father]. In our case, there's an aggravated circumstance finding for the sexual abuse of [Faith]. There ha[ve] been . . . over 17 different reports to [DFPS] during these children's lives. There's been three out-of-home placements for [Luke]. There's been two out-of-home placements for [Faith]. We've heard she's spent half of her life in foster care. The rest of her life she's spent being investigated for neglect and for physical abuse and medical neglect and now sexual abuse.

. . . .

[DFPS] has a plan for these children going forward that would be a permanent plan, placing the children together. They're receiving the therapies that they need, they're receiving the medication they need, they're receiving the education opportunities that they need and we would ask that the Court find that it's in their best interest that parental rights be terminated.

The trial court found by clear and convincing evidence that Father had endangered the children when he (1) knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endangered their physical or emotional well-being (subsection (D)) and (2) engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangered their physical or emotional well-being (subsection (E)). *See id.* § 161.001(b)(1)(D), (E). The trial court further found by clear and convincing evidence that termination of Father's parental rights was in the children's best interest and specifically found that the termination was not based on the fact that Father was economically disadvantaged. *See id.* § 161.001(b)(2), (c)(2). The trial court named DFPS as the children's permanent managing conservator.

8

Father now appeals the order of termination and argues in three issues that the evidence was factually insufficient to support the trial court's endangerment and best-interest findings.

## II.  SUFFICIENCY OF THE EVIDENCE

### A.  STANDARD AND SCOPE OF REVIEW

Although the parent-child relationship is to be protected, it may be terminated upon a showing by clear and convincing evidence that the parent's actions satisfy a statutory ground justifying termination and that termination would be in the child's best interest.  *Id.* §§ 161.001(b), 161.206 (West Supp. 2017); *In re E.R.*, 385 S.W.3d 552, 554–55 (Tex. 2012).  Evidence is clear and convincing if it "produce[s] in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established."  Tex. Fam. Code Ann. § 101.007 (West 2014).

When the factual sufficiency of the evidence is challenged, we review the entire record in the light most favorable to the finding, giving due deference to the fact-finder's findings, and may not supplant the judgment with our own.  *In re A.B.*, 437 S.W.3d 498, 500 (Tex. 2014).  Evidence is factually sufficient if a fact-finder could reasonably form a firm conviction or belief that the parent violated a conduct provision of section 161.001(b)(1) and that the termination of the parent-child relationship would be in the children's best interest.  *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002).

## B. ENDANGERMENT GROUNDS

The trial court found that Father's conduct endangered the children, satisfying two conduct grounds supporting termination—subsections (D) and (E). *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E). In his second and third issues, Father argues that the evidence was factually insufficient to support either endangerment ground. Although DFPS was required to prove only one conduct ground listed in section 161.001(b)(1) to support the trial court's termination determination, we will address both grounds in tandem based on the interrelated nature of the endangerment facts. *See In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003); *In re M.R.J.M.*, 280 S.W.3d 494, 503 (Tex. App.—Fort Worth 2009, no pet.) (op. on reh'g).

Under subsection (D), we must examine evidence related to the environment of the children to determine if the environment was the source of endangerment to the children's physical or emotional well-being. *In re D.T.*, 34 S.W.3d 625, 632 (Tex. App.—Fort Worth 2000, pet. denied) (op. on reh'g). A child is endangered when the environment creates a potential for danger that the parent is aware of but disregards. *In re S.M.L.*, 171 S.W.3d 472, 477 (Tex. App.—Houston [14th Dist.] 2005, no pet.). Under subsection (E), the inquiry is whether evidence exists that the endangerment of the child's physical or emotional well-being was the direct result of the parent's conduct, including acts, omissions, and failures to act. *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—

10

Fort Worth 2003, no pet.). A single act or omission is insufficient; a voluntary, deliberate, and conscious course of conduct by the parent is required. *Id.*

Although Father suffered from bipolar disorder, requiring treatment and hospitalizations in the past and causing him to have suicidal thoughts, Father admitted that he was not under a doctor's care for the disorder and was unable to take his required medication. Faith and Luke frequently went days without food and occasionally the food at their home contained mouse droppings even though Father received government assistance. Although Father stated that there had only been one mouse in their hotel room, which he testified the children were "fascinated" with, Faith reported that there were multiple mice in the trash cans and that she was bitten by them. The children were routinely dirty and tired when they arrived at school, with Luke being so tired he had dark circles under his eyes and would fall asleep at school. Indeed, Luke's teachers began to provide clothes and hygiene products for him, and Faith frequently would be sent to the nurse so she could clean up and get a change of clothes. Father regularly left the children at home alone. So much so that the police were called multiple times when the children were found outside unattended. Father did not dispute that he left the children without supervision, arguing instead that he had no choice but to leave them alone. But apart from the children being unsupervised at such young ages, Faith was being left alone with Luke, who had emotional disabilities and had been seen being "very physical" and "cruel" to Faith. There was also evidence that Father had physically abused the children and that the

11

abuse turned sexual with Faith. Although Father categorically denied Faith's sexual-abuse allegations, the fact-finder was free to credit instead the testimony of Garcia and Knight regarding Faith's outcry statements.

All of this conduct, which was more than an isolated act or omission, allowed a reasonable fact-finder to reasonably form a firm conviction or belief that Father's acts and omissions endangered the children. *See, e.g.*, *In re S.H.*, No. 02-17-00188-CV, 2017 WL 4542859, at *10–11 (Tex. App.—Fort Worth Oct. 12, 2017, no pet.) (mem. op.); *In re J.R.*, 501 S.W.3d 738, 743–44 (Tex. App.—Waco 2016, no pet.); *In re M.L.F.*, No. 02-13-00459-CV, 2014 WL 2465137, at *14 (Tex. App.—Fort Worth May 29, 2014, no pet.) (mem. op.); *In re J.A.S.*, No. 07-12-00150-CV, 2012 WL 4372952, at *6 (Tex. App.—Amarillo Sept. 25, 2012, no pet.) (mem. op.); *In re R.W.*, 129 S.W.3d 732, 742 (Tex. App.—Fort Worth 2004, pet. denied); *In re K.M.B.*, 91 S.W.3d 18, 24–25 (Tex. App.—Fort Worth 2002, no pet.). And Father's argument that the trial court's endangerment findings were nothing more than a judgment on his economic status is incorrect under the facts of this case. *See generally* Tex. Fam. Code Ann. § 161.001(c)(2) (prohibiting termination if findings based on evidence that parent is economically disadvantaged); *In re S.I.-M.G.*, No. 02-12-00141-CV, 2012 WL 5512372, at *11 (Tex. App.—Fort Worth Nov. 15, 2012, no pet.) (mem. op.) ("A parent's rights cannot be terminated based on poverty without a showing that the poverty has endangered the child.").

The evidence showed that Father's conduct, not his poverty, endangered the children. Father received food stamps but did not provide sufficient food for the children, allowing a reasonable fact-finder to find that the children were hungry because Father chose not to provide food for them. Father also refused DFPS's offered childcare services, again showing that Father voluntarily chose to leave the children unattended rather than use available community assistance. Father's sporadic employment led to unstable housing, causing the children to live in unsanitary conditions in a hotel with no reliable phone service and little access to food. And Father seemed to attribute his employment problems to the children, arguing that he "lost all of those jobs" because he chose his children over his job "every time." The endangerment findings were not based on Father's economic status but on his inability to provide for the children's basic needs and on his voluntary conduct that endangered the children. *See In re A.N.*, No. 02-14-00206-CV, 2014 WL 5791573, at \*18–19 (Tex. App.—Fort Worth Nov. 6, 2014, no pet.) (mem. op.); *In re D.R.*, No. 2-06-146-CV, 2007 WL 174351, at \*4–6 (Tex. App.—Fort Worth Jan. 25, 2007, no pet.) (mem. op.) *cf. In re S.L.W.*, 529 S.W.3d 601, 613 n.10 (Tex. App.—Texarkana 2017, pet. denied) ("The evidence established that [Father] had maintained regular employment and appropriate housing and, although there was evidence [Father] had difficulty paying some fees, the evidence did not establish, by clear and convincing evidence, that [the child's] needs would go unmet if she were to reside with [Father]."). We overrule issues two and three.

13

## C. BEST INTEREST

In his first issue, Father argues that the evidence was factually insufficient to support the trial court's finding that termination of his parental rights was in the children's best interest. A child's best interest is a trial court's "primary consideration" when determining conservatorship, possession, or access to the child. Tex. Fam. Code Ann. § 153.002 (West 2014); *see also id.* § 161.205 (West 2014) (stating if termination not ordered, trial court may either deny the petition or "render any order in the best interest of the child"). There is a strong presumption that keeping a child with a parent is in the child's best interest. *See In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). But the emotional and physical interests of the child may not be sacrificed merely to preserve the parent-child relationship. *See E.C.R.*, 402 S.W.3d at 240. There are several nonexclusive factors a trial court may consider in determining a child's best interest, including the emotional and physical needs of the child now and in the future, the parenting abilities of the individuals seeking custody, the plans for the child, the stability of the home or proposed placement, the acts or omissions of the parent indicating that the parent-child relationship is not a proper one, and the desires of the child. *See* Tex. Fam. Code Ann. § 263.307 (West Supp. 2017); *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *see also C.H.*, 89 S.W.3d at 27. The same evidence may be probative of both conduct and best interest. *E.C.R.*, 402 S.W.3d at 249.

14

After the children were removed from Father, both Luke and Faith rapidly improved. Faith began seeing a counselor, Luke participates in play therapy, and both are taking needed medications.[6] Luke's behavioral issues subsided and he was able to regularly stay awake during school. Guidry testified that Father had damaged Faith and that Faith desired reunification with Luke but not with Father. Betty testified that the Atkins family is able to provide the supervision Luke needs. Although Faith's current foster home was not willing to adopt her, the Atkins family was willing to do so and planned to adopt Luke. Betty believed that the children's best interest would be best served by their reunification in her home, and Luke expressed that he wants to be with the Atkins family "forever." Robinson testified that if it was not possible to reunite Luke with Faith based on his behavior, DFPS would find an adoption-motivated placement for her. Robinson stated that stability and permanence were very important for the children, which they could get only through termination of Father's parental rights. The children's attorney ad litem and Robinson both stated that the termination of Father's parental rights was in the children's best interest.

We conclude that this evidence, combined with the evidence of Father's endangering conduct, allowed the fact-finder to reasonably form a firm conviction or belief that the termination of Father's parental rights was in the children's best interest. *See C.H.*, 89 S.W.3d at 28; *S.H.*, 2017 WL 4542859, at *12–14; *In re*

---

[6]Luke requires medication for his attention-deficit disorder, aggression, and sleep disorder; Faith needs medication for her attention-deficit disorder and anxiety.

15

*A.L.*, 545 S.W.3d 138, 150 (Tex. App.—El Paso 2017, no pet.); *In re H.W.*, No. 11-00-00385-CV, 2002 WL 32344346, at *5–6 (Tex. App.—Eastland June 27, 2002, no pet.) (not designated for publication). *See generally* Tex. Fam. Code Ann. § 263.307(a) (presuming prompt and permanent placement of child in safe environment is in child's best interest). And we again disagree with Father that the best-interest evidence shows nothing more than that Father was economically disadvantaged. *See In re A.R.C.*, No. 11-17-00362-CV, 2018 WL 3060949, at *3 (Tex. App.—Eastland June 21, 2018, no pet. h.) (mem. op.); *In re J.J.D.*, No. 13-11-00388-CV, 2012 WL 2361796, at *6 (Tex. App.—Corpus Christi June 21, 2012, no pet.) (mem. op.). We overrule issue one.

## III. CONCLUSION

The evidence was factually sufficient to support the fact-finder's findings that Father engaged in endangering conduct as defined in subsections (D) and (E) and that termination of Father's parental rights was in the children's best interest. Accordingly, we overrule Father's appellate issues and affirm the trial court's order of termination. *See* Tex. R. App. P. 43.2(a).

/s/ Lee Gabriel

LEE GABRIEL
JUSTICE

PANEL:  SUDDERTH, C.J.; GABRIEL and BIRDWELL, JJ.

DELIVERED:  July 12, 2018

16