**Opinion issued December 5, 2024**



**In The**

# Court of Appeals

**For The**

# First District of Texas

_____

**NO. 01-24-00509-CV**
_____

**IN THE INTEREST OF A.B.-G AND D.B., CHILDREN**

---

**On Appeal from the 313th District Court**
**Harris County, Texas**
**Trial Court Case No. 2023-01050J**

---

## MEMORANDUM OPINION

The trial court entered a final decree terminating the father's and mother's parental rights as to two children. The father does not appeal. The mother does.

The mother contends the evidence is legally and factually insufficient to support the trial court's decree terminating her rights. She also contends the trial

court erred in appointing the Texas Department of Family and Protective Services as the children's sole managing conservator. We affirm the trial court's decree.

## BACKGROUND

After a bench trial, the trial court entered a decree terminating the parental rights of the mother as to two of her young children: a daughter who was three-and-a-half years old at the time of trial and a son who was then two years old. The trial court found that termination was warranted because the mother had knowingly placed or knowingly allowed these children to remain in conditions or surroundings that endangered their physical or emotional wellbeing and because the mother failed to comply with the provisions of a court order that established the actions necessary for her to obtain the return of these children. TEX. FAM. CODE § 161.001(b)(1)(D), (O). The trial court additionally found that termination of the mother's parental rights was in these children's best interest. *Id.* § 161.001(b)(2). Finally, the trial court appointed the Department as the sole managing conservator of these two children.

Seven witnesses testified at trial, including both the father and mother.

### Caseworker's Testimony

Velda Gibson, the caseworker for the children, was assigned to the case near the beginning. She testified the Department became involved after receiving a report from a motel's staff that the family had been living in an SUV in the motel's parking lot for "quite a few days." At the time, the mother had six children, five of whom

2

were living in the SUV. The children were malnourished and flea-bitten. The SUV's air conditioner was not working, and the SUV may have been inoperable. The inside of the SUV was dirty and unkempt, including the presence of used diapers and feces.

As a result, the Department removed the children from the parents' care. The two youngest children who were present came into the Department's care: a daughter, ABG, who was then two-and-half-years old and a son, DB, who was then one year old. The three older children who were present have a different father than ABG and DB, and those three were placed in the care of their paternal grandmother. This sixth and oldest child did not live with the parents. The Department did not know this child's whereabouts. Gibson stated the mother said a friend "took him from her and she doesn't know where he is." This suit solely concerns ABG and DB.

Two weeks after ABG and DB were removed from their parents' care, the case was transferred to Gibson in her role as caseworker and she met the children in person. Both of them were covered from head to toe in fleabites, scabs, and open wounds from scratching the bites. Some of their wounds appeared to be infected.

DB had a severe diaper rash. Gibson described the rash as being "so severe that his white meat was showing on his bottom from having moisture on there."

Neither ABG nor DB had had their scheduled vaccinations when removed.

The initial caregiver into whose custody ABG and DB were placed had served as a foster parent for 25 years. Gibson testified that this caregiver reported she had

3

"never seen children that acted the way they do." ABG "cursed terribly" and called the caregiver "all kinds of foul names." Both children "played in their own feces." ABG would also smear her feces on the walls. Neither child seemed used to eating solid food, which resulted in digestive distress. According to Gibson, "Whatever they ate, came right out. So, it took a while for their digestive system to tolerate fresh foods or real foods." Both ABG and DB "wanted junk food" and they "often would cry if they would see chips or soda" or "scream." They displayed what Gibson described as "food insecurity." When given snacks, "they would eat till they made themselves sick, especially ABG, who would just eat until "she would throw up."

This first foster placement ended due to a false allegation the mother made.

The children are now on their third foster placement. None of the behaviors their first caregiver experienced persist in their current placement. Both of the children have been "doing exceptionally well" with their current foster mother. For example, ABG is "completely potty-trained" and DB "is being potty-trained."

Both children are enrolled in daycare. ABG "is in gymnastics" and is "doing well with her school." Gibson described their current foster home as "happy" and "healthy." Gibson further opined that the children are "thriving" in their foster home. They have a consistent, stable day-to-day routine or schedule. The children also have friends, whereas before removal they were "not well-adapted to anything."

The mother has consistently visited ABG and DB biweekly while they have been in foster care. Gibson stated that she had to admonish the mother for arriving 30 to 40 minutes late, but Gibson said the mother behaved appropriately during the visits. ABG and DB are both affectionate with their mother, though Gibson noted that the children are warm and affectionate in general and loving with everyone.

Unbeknownst to the Department, the mother was pregnant during the pendency of this suit. When Gibson was informed by another that the mother was pregnant, she asked the mother if this was true. The mother denied being pregnant. Gibson was later informed that the mother had given birth to her seventh child. When Gibson asked the mother about this, the mother said the child was stillborn. Another caseworker was assigned to investigate the matter. The mother told this other caseworker a different story, claiming that she gave the baby to her mother. The mother's mother, who was very ill and hospitalized, denied this story. Gibson testified that she saw the mother with her seventh child shortly before trial. When confronted by Gibson, the mother did not deny this was her seventh child.

At the time of trial, the Department had an open investigation of the mother and her seventh child. Gibson was not the caseworker assigned to it. Gibson testified she thought the parents kept the newborn in Galveston to keep her "off our radar."

Gibson further testified that the mother satisfied some but not all of the requirements of her court-ordered family service plan. The mother completed a

parenting class. But she had been dismissed from individual counseling or therapy after missing several appointments. The mother eventually resumed counseling and was continuing to see a counselor or therapist at the time of trial. Gibson testified that the provider indicated the mother would require quite a few additional appointments. In part, Gibson testified, there was a concern that the mother was being dishonest, and that counseling or therapy could not succeed without honesty.

In addition, the mother had not provided a W-2 or pay stub to confirm she is employed. According to Gibson, the mother has represented that her employer, the West Columbia Washateria, pays in cash "under the table." However, the mother also has not supplied alternative verification of her employment. Gibson spoke with the ostensible owner or operator or the Washateria, who did say the mother worked there, but that the amount paid "varies from week to week, month to month."

With respect to the family service plan's requirement that the mother maintain stable housing, Gibson testified that the mother did have housing at the time of trial and had supplied a copy of her lease to the Department. But the landlord had filed to evict the mother three times during the pendency of this suit for nonpayment of rent. The mother had avoided eviction by paying. Gibson also testified that the mother was behind on her rent and once again facing the possibility of eviction.

When Gibson visited the mother's current apartment about three months before trial, it was presentable. But Gibson noted that there appeared to be no clothes

whatsoever in the house. When she asked the mother about this, the mother said that all of clothes were at a laundromat. According to Gibson, the mother claimed that only she and her newborn resided there. But the father was also listed on the lease. In part, this concerned Gibson because there had been multiple "domestic violence calls to the home," though she conceded there were no arrests or convictions.

Overall, Gibson opined that the mother's dishonesty and inconsistency prevented the Department from being able to work with the mother to address the issues that had resulted in her children's removal from her care. Gibson said the mother's dishonesty made it impossible to know what is going on. She remarked, "If I can't trust what you're saying or doing, how can we move forward?" Gibson testified that to date the mother had not admitted "that there was a problem" and often asked Gibson why the Department had intervened and removed the children.

The mother proposed her own mother as a possible caregiver for the children after the Department intervened. The Department made a home assessment and found she was not a viable candidate, as she has a serious chronic illness and other functional limitations, like illiteracy. Nor has the Department been able to identify a blood relative of the mother (or the father) who could care for the children.

Gibson asked the trial court to terminate the mother's parental rights as to ABG and DB based on child endangerment and failure to satisfy the requirements of the court-ordered family service plan, opining that termination of the mother's

rights is in their best interest. If the children were returned to their mother, Gibson testified, they would lack security and stability. Gibson stated that the Department's long-term goal is adoption by the children's current foster mother. In the interim, she asked that the Department be appointed sole managing conservator.

## Current Child Advocate's Testimony

Mitsuko Peters, the assigned child advocate, likewise testified that termination of the mother's parental rights is in the best interest of ABG and DB. Peters also agreed that appointment of the Department as sole managing conservator until the current foster mother could adopt the children is in the children's best interest.

Peters testified that when the Department removed the children, the parents claimed they had an apartment in another city. Peters made contact with this apartment complex. The property manager told Peters that the parents were evicted the month before the removal due to numerous lease violations, including unauthorized occupants, excessive noise complaints, and strong marijuana odor.

Peters also investigated the mother's current housing situation. She spoke with the property manager, who verified that the mother and father had a lease. The apartment complex had filed to evict them four times during the ten months or so in which they had been tenants there, including once the month before trial. The apartment complex does not intend to renew the lease and issued a letter of nonrenewal due to lease violations, including overoccupancy and late payments.

Peters made an unannounced visit the month before trial. She testified the bottom floor had "a heavy smoke smell" and the second floor had "a strong urine smell." In her written report to the trial court, Peters attributed the smoky smell to cigarettes, describing the odor as "cigarette smoke layered with air freshener."

The kitchen was full of unwashed dishes. The mother explained that she was waiting on the sink to be repaired. There also was no hot water in the apartment at the time. The mother again explained that the hot water heater needed to be repaired.

The mother told Peters that only she and her newborn child resided there. But the father was there bottle-feeding the newborn when Peters arrived. Peters could not say whether the father was actually living there or not. Peters testified that the newborn (a baby girl) appeared alert and happy. The child was properly clothed.

In the end, Peters concluded that the mother's housing was unstable. She based this conclusion on the past eviction filings and the nonrenewal of the lease.

Peters tried to verify the mother's employment. The mother was working at a laundromat, and the owner or boss provided a letter verifying her employment. Since that time, the mother "has taken over the position." That is, the mother apparently has taken over the laundromat business as its operator. Since then, it has "been a little difficult to try to verify" her income, as she is self-reporting her income.

The mother's family service plan required her to complete a psychosocial assessment as well as any resulting recommendations, one of which included a

psychological evaluation. But she has not completed a psychological evaluation. The same is true with respect to the counseling or therapy required by the service plan.

Peters testified the mother twice tested positive for marijuana use during the pendency of this suit. But Peters agreed that the mother otherwise tested negative. The mother's explanation for these two positive tests was that she buys "nicotine vape products" from a "smoke shop" and was exposed secondhand there. The two positive results were hair-follicle tests, not urinalysis. In her written report to the trial court, Peters noted that in the caseworker's opinion, the mother did not need to complete a substance-abuse assessment "as she has not shown a pattern of drug use." Peters was more cautious in her report, suggesting ongoing drug use was possible based on the mother's two positive drug tests and several missed drug tests.

The mother did successfully satisfy one requirement of her family service plan: a parenting course. And Peters testified that the mother appeared to be using what she learned from this course during her visits with the children. The mother "seemed to nurture her children, was teaching them how to play, guiding them." Based on the visits she observed, Peters said "they seem to be a loving family." In fact, Peters went further, unequivocally stating: "There is love there. It's obvious."

Like the caseworker, Peters was concerned by the mother's "dishonesty throughout the case." The mother's counseling or therapy is designed in part to address her decision-making skills. But because the mother has not been truthful,

Peters said "we are not quite sure how effective these sessions have been." The mother's counselor expressed this concern about the mother's honesty as well.

Similarly, Peters was concerned that the mother (and father) "denied the reasons the children were removed" by the Department and placed in foster care.

Overall, Peters thought the mother had not shown she could provide the kind of stability and safety the children needed, which she considered significant because it was lack of stability and safety that had resulted in their removal. In contrast, Peters testified that ABG and DB's current foster home is "very appropriate," and that the children's foster family is taking care of all their emotional and physical needs. The children see a pediatrician regularly and they are now current on their immunizations. Peters said ABG and DB are thriving in their foster placement.

ABG has been diagnosed with "adjustment disorder with mixed disturbance of emotions and conduct." She shows anxiety when separated from others, including her foster caregivers and her parents. She is "participating in play therapy to increase her social skills" and the therapist is also "helping her to manage her emotions."

**Prior Child Advocate's Testimony**

Lorin Perez was initially assigned as the child advocate in this case before Peters. Perez testified that she asked the mother if she was pregnant during the pendency of this case, and the mother denied being pregnant. Perez said she asked in part because she saw the mother smoking during this time, and Perez was

concerned about the effect on the baby if she was in fact pregnant. Later, after the child was born, the mother told Perez and the trial court that she had a miscarriage.

Perez thought it was "really important" for the mother to complete a psychological evaluation. An evaluation was one of the recommendations resulting from her psychosocial assessment, in which she was diagnosed with an "adjustment disorder." The purpose of the psychological evaluation would be to "to rule out additional mental issues or post-traumatic stress disorder." Perez explained that she became concerned about the mother's mental health based on the mother's decision-making during the pendency of this suit. Perez did not think the mother's individual counseling or therapy had adequately addressed these mental-health concerns.

When asked whether the mother's parenting skills had improved over the course of the last year, Perez replied, "Decision-making is a part of parenting and, just given the events in this case, I still feel that those are a concern." Perez noted that the mother "denied the reason for removal" or that removal was warranted, and Perez did not think she could meet the children's emotional and physical needs.

### Foster Mother's Testimony

The current foster mother of the children testified. ABG and DB had been in her care for six months at the time of trial. ABG was three years old when she came into the foster mother's care; DB was a little more than one-and-a-half years old.

12

When ABG came into the foster mother's care, she was not potty-trained. The foster mother has since gotten ABG fully potty-trained. DB likewise was not potty-trained, and the foster mother is still working with him to get him to use the toilet.

Both children are in daycare. ABG receives four hours of "play therapy" per month while she is in daycare. The therapist comes to the daycare to provide this therapy. In part, the purpose of this therapy is to treat her "adjustment disorder."

The foster mother said ABG "is in gymnastics" and both she and DB "love to play outside." The foster mother and her partner refer to DB as "our little tornado because he is just so rambunctious and loves to be in everything." Together, they engage in a lot of family activities, including swimming and visiting grandparents.

The members of the household are the foster mother, her partner, ABG, DB, another foster son who was eight years old at the time of trial, and two dogs. If their other foster son becomes available for adoption, they would like to adopt him. He loves ABG and DB, referring to them as "sister" and "brother," respectively.

The foster mother testified that she wanted the trial court to do whatever is in ABG's and DB's best interest. She testified that she and her partner are "willing to adopt" both ABG and DB, but they would still provide a permanent home for ABG and DB if the biological mother's parental rights were not terminated. The foster mother further testified that she and her partner "love them very much," like ABG

and DB are their own children, and "have bonded with them." According to the foster mother, the children call her and her partner "mommy" and "momma."

The foster mother is a licensed clinical social worker who works outside of Harris County. The foster mother's partner works in a human-resources job.

### Mother's Testimony

The mother agreed that she has seven children. She further agreed that she did not know the whereabouts of one of these children, who is now 11 years old. According to the mother, CPS removed this child from her care at birth. The mother then signed a power of attorney in favor of a friend, who used the document to "run off" with her child. She has not seen this child since. She insisted that her parental rights have not been terminated or relinquished as to this child. She explained that she does not trust CPS as a result of this episode: "That's why I don't trust anything."

The mother also agreed that she had her seventh child, a daughter, during the pendency of this suit. She testified that she did not remember when she realized she was pregnant but thought it was sometime around the middle of her pregnancy.

After the mother's seventh child was born, Gibson asked the mother if she had given birth. The mother conceded she denied doing so and told Gibson that the child had been stillborn. The mother initially seemed to concede that she still had not informed her therapist that she had given birth to a seventh child. But the mother then testified that the therapist knew because the mother took the child to therapy.

14

At any rate, she agreed she did not tell her therapist while she was pregnant or within two months or so of the child's birth even though the therapist asked about this. The therapist asked because the mother had the child with her at an appointment, and the mother lied and told the therapist that she was babysitting a neighbor's child.

At the time of trial, the mother's seventh child was five months old. The mother testified that this child is doing well. The mother stated this child has food, clothing, and other necessities. This child is current on her vaccinations. The mother and father are coparenting this child, and the father helps provide for this child.

The mother agreed that the father is on the lease for her apartment. But she denied that the father lives with her, saying that he only stays overnight sometimes. She testified that the father "stays with his mother" but she did not know the address.

The mother agreed that she has been late with the rent. But she disagreed as to how many times this happened. She said she was late just three times. She likewise agreed she had received more than one eviction notice but disputed how many. The mother also denied receiving a letter from her landlord as to the nonrenewal of her lease. She said she did not intend to renew the lease due to an electrical fire there. The mother testified she does not intend the father to be on the next lease.

The mother's current lease was set to end two months after trial. She testified that she had identified a new apartment for rent but could not state its address or name. She acknowledged that she had not yet signed a lease for the new place.

15

The mother agreed that she told Peters her positive test results for marijuana were due to secondhand exposure, as opposed to personal use of marijuana. The mother explained that she used to vape nicotine and would get her vape products from a nearby "smoke shop," at which she was exposed to marijuana smoke.

The mother denied that five children were living in an SUV at the time that ABG and DB were removed from her care. She testified that they were only staying in the SUV in the daytime. She agreed the SUV was inoperable but said it had AC. She also agreed the SUV was not sanitary and two dogs were kept in it as well.

When CPS showed up at the SUV to remove the children from the mother and father's care, the mother was not present at the vehicle, returning sometime afterward around 7:00 p.m. The mother testified that she was nearby trying to get work to pay for "diapers, food and all the necessities." The mother stated that she and the father already had enough money to get a hotel room for the night.

The mother conceded the children had fleabites all over their bodies at the time of removal. She also conceded that they had rashes and open wounds.

The mother agreed that ABG and DB were unvaccinated when they were removed from her care. When asked to explain why this was so, she responded, "Due to harassment and someone was also—I have HIPAA violations on my records." She explained that her "ex works as a nurse" and would use her records to find her. As a result, the mother said she was too "terrified" to get the children vaccinated.

16

The mother conceded that the other three children who were living with her and removed from her care had not been enrolled in school at the time. Their ages at the time are not clear from the record, but one or two of them were then school-aged.

The mother does not have a driver's license. She has never had one.

The mother said she works "at a washateria," which she became the owner of under an oral sales agreement two months before trial. She makes a $300 weekly payment under that oral agreement and keeps the remainder of the revenue from the laundromat as her income, which ranges between $400 to $700 a week, depending on how business is on a given week. But the mother testified that she is looking for another job, as both her work there and her continued ownership are uncertain.

The mother testified that she has actively engaged with the Department to remedy the problems that led to her children's removal, including going to therapy and completing a parenting class. The former has helped her deal with her emotions, and the latter has helped her with her decision-making. She has learned not to be too overbearing. When she was asked if she was willing to continue working services and attending therapy, the mother replied, "I would do anything for my children."

### Father's Testimony

The father testified that he, the mother, and the five children who were present at the time of removal had been staying in a room at the motel, not in the SUV. He stated that when CPS showed up, the children were outside playing while he smoked.

17

At the time, the mother was not present; she was cleaning rooms for money. She was the only one with keys to the room, and he had inadvertently locked himself out.

The father agreed that the children had fleabites and scabs when removed.

The father testified that he lived with his mother in northwest Houston. Before that, he had been living with the mother in the apartment. Now, he only stays there overnight if the mother has been unable to get a babysitter while she works. He estimated that he watches their new baby about two or three times per month.

The father does not have a driver's license. He has never had one. His mother's place is about an hour and fifteen minutes away from the apartment. The father testified that his mother drops him off there when he needs to babysit.

The father acknowledged that peace officers responded to multiple disturbance-related calls at the apartment. He attributed most of these calls to a neighbor who called the police "whenever she would hear any form of noise." He acknowledged that two calls differed, one involving a stolen vehicle and another involving burglary, but he was never arrested or charged regarding any calls.

The father stated that he worked as a "power washer" for his parents. At the time of trial, he had held this job for between two to four weeks. He makes around $11.00 an hour. The hours fluctuate but average out to about seven or eight hours; whether this figure is per day or week or otherwise is unclear from the record. The father stated that he had not yet been paid and did not know when he would be.

His previous job was at a fast-food restaurant about two or three months prior. He was fired from that job for leaving to go to the hospital to visit the most recent child he had with the mother (the one born during the pendency of this case). The father testified that this child had "stopped breathing" and thus was hospitalized.

The father admitted that he had not completed some requirements of his court-ordered family service plan, including counseling. He was dismissed from counseling by the provider for missing appointments. The father also did not complete the plan's substance-abuse-related requirements. A substance-abuse assessment entered into evidence showed that he was diagnosed as meeting "the criteria indicative of a mild to moderate substance abuse problem," specifically, a moderate cannabis-use disorder, and it was recommended that he seek outpatient treatment as a result. The father admitted that he tested positive for marijuana use and that he failed to show for multiple drug tests during the pendency of this suit.

The father completed a parenting course, and he said that he learned from it.

The father testified that he loves ABG and DB and wanted them returned. He said he "already lost two children to CPS" who he had with another woman and that he did not want to lose any more. He stated that he needs ABG and DB, and he thought it would be in their best interest for them to be with their parents as well.

## Peace Officer's Testimony

The Department also called to the stand Officer A. Parnell, who is employed by the West Columbia Police Department. Parnell testified about multiple occasions on which she or other peace officers were dispatched to the mother's residence.

Among other things, Parnell testified that the mother tried to mislead CPS about her housing circumstances. According to Parnell, she was dispatched to the mother's apartment in February 2024 in response to a complaint from a roommate. The mother had put the roommate's belongings in trash bags and placed them outside the apartment, and she had done the same thing with the father's belongings. Parnell said that the mother had done so in an effort to conceal that the father and roommate resided with her in anticipation of a scheduled visit from CPS, as the mother had not disclosed to CPS that the father and roommate resided with her.

Parnell also testified that if there are children in the mother's home, she would be concerned about these children based on her own observations as well as the reported state of the home. Among other things, Parnell had been informed by others that the mother's apartment was in a state of "complete disarray" and unsanitary.

Parnell conceded that she had never been inside the mother's apartment. But as part of her interactions with the mother, Parnell indicated that she had seen a photograph of two thin chihuahuas in a kennel inside the apartment. Parnell stated that the kennel was soiled with urine and feces and the dogs were covered in fleas.

**Trial Court's Judgment**

The trial court terminated the parental rights of the father and mother as to ABG and DB. With respect to both parents, the trial court found they knowingly placed or knowingly allowed these children to remain in conditions or surroundings that endangered their physical or emotional wellbeing. *See id.* § 161.001(b)(1)(D). It further found they failed to comply with the provisions of a court order that established the actions necessary for them to obtain the return of these children. *See id.* § 161.001(b)(1)(O). In addition, the trial court found the termination of their rights to be in the best interest of ABG and DB. *See id.* § 161.001(b)(2). Finally, it appointed the Department as the sole managing conservator of the children.

## DISCUSSION

### Legal Standard for Terminating Parental Rights

A parent's rights to the care, custody, and management of his or her child are constitutional in scope. *Santosky v. Kramer*, 455 U.S. 745, 758–59 (1982); *In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003). But parental rights are not absolute; the Department may seek termination of the rights of those who are not fit to accept the responsibilities of parenthood. *In re A.V.*, 113 S.W.3d 355, 361 (Tex. 2003). The primary focus in a termination suit is protecting the child's best interest. *Id.*

To terminate parental rights under the Texas Family Code, the Department must establish that a parent committed one or more statutorily enumerated predicate

acts or omissions and that termination is in the child's best interest. FAM. § 161.001(b)(1)–(2). The Department need only establish one of these statutorily enumerated predicate acts or omissions, along with the best-interest finding. *See id.*; *In re A.V.*, 113 S.W.3d at 362. But the Department must make these showings by clear and convincing evidence. FAM. § 161.001(b). Clear and convincing evidence is "proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007.

The best-interest inquiry is separate and distinct from the one concerning the predicate grounds for termination of parental rights. *In re A.J.D.-J.*, 667 S.W.3d 813, 821 (Tex. App.—Houston [1st Dist.] 2023, no pet.). But evidence used to prove predicate grounds for termination may be probative of a child's best interest. *In re A.A.A.*, 265 S.W.3d 507, 516 (Tex. App.—Houston [1st Dist.] 2008, pet. denied).

Multiple nonexclusive factors bear on a child's best interest. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). These nonexclusive factors include:

- the child's desires;
- the child's emotional and physical needs now and in the future;
- the emotional and physical danger to the child now and in the future;
- the parental abilities of those seeking custody;
- the programs available to assist them to promote the child's best interest;
- their plans for the child or the plans of the agency seeking custody;
- the stability of the home or proposed placement;

- the acts or omissions of the parent that may indicate the existing parent–child relationship is not proper; and

- any excuse for the parent's acts or omissions.

*Id.*; *Yonko v. Dep't of Family & Protective Servs.*, 196 S.W.3d 236, 243 (Tex. App.—Houston [1st Dist.] 2006, no pet.). These nonexclusive factors are not exhaustive, no one factor is controlling, and a single factor may be adequate to support a finding that termination of the parent–child relationship is in a child's best interest on a particular record. *In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002); *In re J.M.T.*, 519 S.W.3d 258, 268 (Tex. App.—Houston [1st Dist.] 2017, pet. denied).

In evaluating a child's best interest, we also may consider several factors set forth in section 263.307 of the Family Code. *In re D.L.W.W.*, 617 S.W.3d 64, 81 (Tex. App.—Houston [1st Dist.] 2020, no pet.); *see* FAM. § 263.307(a)–(b) (stating that prompt placement of child in safe environment is presumed to be in child's best interest and enumerating 13 factors courts should consider in deciding whether child's parents are willing and able to provide child with safe environment).

**Legal and Factual Sufficiency Review in Termination Cases**

In this appeal, the primary issues are legal and factual sufficiency of the evidence. Due to the elevated burden of proof in a termination suit—clear and convincing evidence—we do not apply the traditional formulations of legal and factual sufficiency on appeal. *In re A.C.*, 560 S.W.3d 624, 630 (Tex. 2018); *see also*

FAM. § 101.007 (clear and convincing evidence is "proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations").

In a legal-sufficiency review in a termination case, we cannot ignore undisputed evidence contrary to a finding, but we must otherwise assume the factfinder resolved disputed facts in the finding's favor. *In re A.C.*, 560 S.W.3d at 630–31; *see In re K.M.L.*, 443 S.W.3d 101, 112–13 (Tex. 2014) (reviewing court credits evidence supporting finding if reasonable factfinder could and disregards contrary evidence unless reasonable factfinder could not). The evidence is legally insufficient if, viewing all the evidence in the light most favorable to a finding and considering undisputed contrary evidence, a reasonable factfinder could not form a firm belief or conviction that the finding is true. *In re A.C.*, 560 S.W.3d at 631.

In a factual-sufficiency review in a termination case, we must weigh disputed evidence contrary to a finding against all the evidence in the finding's favor. *Id.* We consider whether the disputed evidence is such that a reasonable factfinder could not resolve the conflicting evidence in the finding's favor. *Id.* The evidence is factually insufficient if, in view of the entire record, the disputed evidence that a reasonable factfinder could not credit in the finding's favor is so significant that the factfinder could not have formed a firm belief or conviction that the finding is true. *Id.*

In reviewing for evidentiary sufficiency, however, we must not usurp the factfinder's role. *In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014). Deciding whether,

24

and if so to what degree, to credit the evidence is the factfinder's role, not ours. *In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009). The factfinder is the sole arbiter of witness credibility. *Id.*; *In re J.S.*, 584 S.W.3d 622, 634 (Tex. App.—Houston [1st Dist.] 2019, no pet.). In a bench trial, the trial judge is the factfinder who weighs the evidence, resolves evidentiary conflicts, and evaluates witnesses' credibility. *In re R.J.*, 579 S.W.3d 97, 117 (Tex. App.—Houston [1st Dist.] 2019, pet. denied).

## Analysis

### *Child Endangerment*

In her first issue, the mother asks us to review whether legally and factually sufficient evidence supports the trial court's child-endangerment finding due to the collateral consequences this finding could have in any future termination proceeding. As she rightly points out, under section 161.001(b)(1)(M) of the Texas Family Code, a finding of child endangerment under section 161.001(b)(1)(D) in a prior suit is a predicate ground for termination of parental rights as to other children.

Given the collateral consequences of a child-endangerment finding, our supreme court has held that the courts of appeals must review the sufficiency of the evidence supporting a child-endangerment finding when it is challenged, regardless of whether another predicate ground for termination supports the trial court's termination decree. *In re N.G.*, 577 S.W.3d 230, 237 (Tex. 2019) (per curiam).

However, the mother does not actually challenge the legal or factual sufficiency of the evidence supporting the trial court's child-endangerment finding. Given the evidence concerning ABG's and DB's circumstances at the time of their removal from the mother's care, she concedes that it "would be futile" to argue that she did not knowingly place or knowingly allow these children to remain in conditions or surroundings that endangered their physical or emotional wellbeing.

Nevertheless, the mother urges us to independently review the evidence, unaided by counsel, due to the collateral consequences of the child-endangerment finding, even though she concedes the finding is "unchallenged" on appeal. We hold the independent review the mother seeks is improper for two interrelated reasons.

First, the supreme court has never suggested that unchallenged child-endangerment findings must be reviewed for evidentiary sufficiency due to the collateral consequences associated with them. The supreme court has only held that the courts of appeals must review child-endangerment findings when challenged. *See In re N.G.*, 577 S.W.3d at 237 (holding that allowing child-endangerment findings to go unreviewed "when the parent has presented the issue to the court" violates parent's right to due process); *see also In re C.W.*, 586 S.W.3d 405, 407 (Tex. 2019) (per curiam) (stating that *In re N.G.* held due process requires review of child-endangerment finding when "parent challenges that finding"); *B.S. v. Tex. Dep't of Family & Protective Servs.*, No. 03-22-00279-CV, 2022 WL 16842084, at

*3 (Tex. App.—Austin Nov. 10, 2022, no pet.) (mem. op.) (holding that *In re N.G.* did not abolish error-preservation requirements as to child-endangerment findings).

Second, it is a blackletter rule of law that an appellate court cannot reverse a trial court's judgment based on an issue the parties do not raise on appeal. *E.g.*, *Pike v. Tex. EMC Mgmt.*, 610 S.W.3d 763, 782 (Tex. 2020). This rule equally applies in the context of parental-termination appeals. *E.g.*, *In re E.A.F.*, 424 S.W.3d 742, 749 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). We cannot presume that the supreme court silently abandoned this rule in *In re N.G. See Lubbock Cty., Tex. v. Trammel's Lubbock Bail Bonds*, 80 S.W.3d 580, 585 (Tex. 2002) ("It is not the function of a court of appeals to abrogate or modify established precedent."). To do so, we would have to ignore the supreme court's careful language to the contrary.

In sum, the mother does not challenge the legal and factual sufficiency of the evidence to support the trial court's child-endangerment finding under section 161.001(b)(1)(D). Therefore, we can only affirm this finding on appeal.

In any event, even if the supreme court modified established precedent on further review in this case so as to make unchallenged child-endangerment findings reviewable, we would hold that the evidence is legally and factually sufficient.

ABG and DB were either living in an inoperable SUV with their parents, three other children, and two dogs or else staying there during daytime hours, depending on whose version of events one credits. Either way, the conditions in the SUV were

27

unsanitary, including the presence of dirty diapers and feces. Both ABG and DB were covered in fleabites, scabs, and open wounds. Some of their wounds appeared to be infected. They both seemed malnourished, a perception later reinforced by their demonstrable food insecurity and their initial inability to tolerate food without experiencing digestive distress. Neither child had received ordinary pediatric medical care, including vaccinations, despite their obvious ill health and injuries.

This evidence, which was undisputed in most respects, is legally sufficient to support the trial court's child-endangerment finding under section 161.001(b)(1)(D), especially in light of their very young ages at the time of their removal, which made the children incapable of doing virtually anything to cope with these deplorable conditions or to alleviate the impact of these conditions. *See, e.g.*, *In re M.C.*, 917 S.W.2d 268, 270 (Tex. 1996) (per curiam) (holding evidence was sufficient to support child-endangerment finding based in part on evidence of very unsanitary living conditions, including cockroach infestation, as well as evidence children were often sick with diarrhea and vomiting and their sickness generally went untreated); *In re J.R.*, 501 S.W.3d 738, 743–45 (Tex. App.—Waco 2016, no pet.) (holding evidence sufficient to support child-endangerment finding based on evidence of unsanitary living conditions, including cockroach and bug infestation, as well as evidence that home lacked edible food and children were generally lice-ridden).

The record contains some evidence that the mother's living conditions have improved since ABG and DB were removed from her care. During the pendency of this suit, the mother leased an apartment. When Peters, the current child advocate, visited this apartment, the one child then in the mother's care, an infant, was clothed and in good health. One might argue that evidence of improved living conditions of this sort renders the evidence of child-endangerment factually insufficient. *See In re J.R.*, 501 S.W.3d at 744 (observing that evidence of unsanitary conditions generally must be persistent, rather than isolated, to justify termination of parental rights).

However, the trial court, sitting as factfinder, could have reasonably discounted this evidence of improvement to some degree, given that this evidence of improvement resulted from a single visit by Peters that took place just one month before trial. *See Smith v. Tex. Dep't of Protective & Regulatory Servs.*, 160 S.W.3d 673, 681 (Tex. App.—Austin 2005, no pet.) (remarking that evidence of recent improvement in behavior does not wholly offset evidence of pattern of instability and harmful behavior). Evidence of recent improvement does not controvert the evidence of the deplorable conditions in which ABG and DB were found to be living at the time of removal. *See In re J.R.*, 501 S.W.3d at 744 (noting that parent's willingness to later clean home does not controvert evidence that she previously endangered wellbeing of child by allowing unsanitary living conditions). Furthermore, the evidence on this point was mixed. The trial court heard testimony

29

from Officer Parnell that the mother's apartment remained unsanitary, including testimony that the dogs inside it had fleas. Parnell stated she would be concerned about children being present there as a result of the condition of the apartment. Similarly, even Peters testified that part of the apartment smelled of urine. Given this mixed evidence, the trial court could have reasonably credited the evidence unfavorable to the mother over the more favorable evidence. *See In re R.J.*, 579 S.W.3d at 117 (noting that when trial court sits as factfinder in bench trial, it weighs evidence, resolves conflicts in evidence, and assesses credibility of witnesses).

Moreover, the trial court heard ample evidence from which it could have reasonably found that the conditions that endangered ABG and DB were likely to recur if they were returned to their mother's care. Though the exact number of eviction notices the mother received during the pendency of this suit is disputed, it is undisputed that she received multiple eviction notices. The Department introduced evidence that the mother's current apartment complex informed her it would not renew her lease due to lease violations, including late payment of rent. The mother disputed this claim. But the mother likewise testified she would be moving out when the lease ended. At trial, she claimed to have identified a new apartment to rent, but she could not state its address or name and agreed she had not yet leased it. She testified she would not be leasing the next place with the father. By her own admission, her income is limited, and her current employment is not particularly

stable. Nor is the father likely to be able to provide meaningful financial assistance to the mother, given his own employment and his limited financial resources.

While poverty is not a basis for terminating parental rights, the preceding evidence indicates that the mother's living circumstances continued to be unstable through trial and that the recurrence of homelessness or something close to it was quite possible. Nor is the evidence of instability limited to evidence of financial distress. It is undisputed that law-enforcement officers have repeatedly been dispatched to the mother's current apartment for a variety of reasons. And while the mother's lease violations include late payment of rent, they also involve other issues that reflect conscious choices rather than mere financial hardship or misfortune. The record contains evidence that there is a pattern of instability resulting from conscious choices, as the mother (and the father) were previously evicted from another apartment for lease violations that included the presence of unauthorized occupants, receipt of excessive noise complaints, and strong marijuana odor. This pattern of instability in the home is significant, given that the children's removal was precipitated by their homelessness or near-homelessness and its impact on ABG's and DB's living conditions, which resulted in malnourishment and injuries.

In view of the entire record, we cannot say the disputed evidence that a reasonable factfinder could not credit in favor of the trial court's child-endangerment finding under section 161.001(b)(1)(D) is so significant that the trial court could not

have formed a firm belief or conviction that this finding is true. Therefore, the evidence is factually sufficient to support this finding. *See, e.g.*, *In re A.L.*, 545 S.W.3d 138, 146–47 (Tex. App.—El Paso 2017, no pet.) (affirming child-endangerment finding based in significant part on very unsanitary living conditions, notwithstanding evidence mother made some effort to address these conditions).

Because the mother does not challenge the legal and factual sufficiency of the evidence concerning the child-endangerment finding, we cannot reverse the finding. But even if she did challenge the sufficiency of the evidence, we would reject her challenge because the evidence is legally and factually sufficient in this regard.

### *Family Service Plan*

The mother argues the evidence fails to show that she did not comply with a material part of her court-ordered family service plan. She therefore posits that the evidence is legally and factually insufficient to support the trial court's finding that termination of her parental rights is warranted under section 161.001(b)(1)(O).

Because we affirm the trial court's child-endangerment finding under section 161.001(b)(1)(D) and a single predicate finding suffices to support the termination of parental rights, we need not review the mother's complaint regarding section 161.001(b)(1)(O). FAM. § 161.001(b)(1); *In re A.V.*, 113 S.W.3d at 362; *see, e.g.*, *In re E.F.K.*, No. 01-24-00120-CV, 2024 WL 3417138, at *6 (Tex. App.—Houston [1st Dist.] July 16, 2024, no pet.) (mem. op.) (declining to review constructive-

32

abandonment finding made by trial court under section 161.001(b)(1)(N), given that mother conceded legally and factually sufficient evidence supported child-endangerment finding made by trial court under section 161.001(b)(1)(E)).

However, we further note that the mother's argument on appeal solely addresses her court-ordered family service plan's requirement that she engage in and complete individual counseling or therapy. In essence, she maintains that she substantially complied with this material requirement, thereby fulfilling it.

Taking the mother's argument at face value, the record contains undisputed evidence that she did not satisfy other aspects of her court-ordered family service plan. For example, her service plan required her to undergo a psychosocial assessment "and follow all recommendations" regarding mental-health issues. She completed the assessment, which resulted in a recommendation for a psychological evaluation. Both Peters and Perez, the current and prior child advocate, respectively, testified without contradiction that the mother had not undergone the psychological evaluation. Perez further opined that it is "really important" for the mother to satisfy this requirement because the mother had been diagnosed with an "adjustment disorder," her decision-making during this suit called her mental health into question, and her individual counseling or therapy had not addressed this issue. Based on this evidence, the trial court could have reasonably found that the mother failed to comply with this requirement and that this requirement was material. *See*

33

*In re J.F.C.*, 96 S.W.3d 256, 277–78 (Tex. 2002) (recognizing that parents' failure to obtain psychiatric evaluation was material noncompliance with service plan).

Because the mother does not dispute that she failed to satisfy this aspect of her court-ordered family service plan and the trial court heard undisputed testimony regarding the importance of this requirement in the context of this particular case, we hold that legally and factually sufficient evidence supports the trial court's finding that termination was likewise warranted under section 161.001(b)(1)(O). *See In re R.J.G.*, 681 S.W.3d 370, 382 (Tex. 2023) (expressing agreement with proposition that parent who fails to satisfy one or more material requirements of court-ordered family service plan cannot avoid termination under section 161.001(b)(1)(O) by showing he or she complied with plan's other requirements and similarly rejecting notion that substantial compliance with family service plan overall may excuse complete failure to comply with material requirement of plan).

### *Best Interest*

The mother argues the evidence is legally and factually insufficient to support the trial court's finding that termination of her parental rights is in the best interest of ABG and DB. In particular, she maintains that almost all of the *Holley* factors are neutral, reflecting that termination is not warranted in this instance. We disagree.

At the outset, we note the mother does not argue that a single *Holley* factor weighs against the trial court's best-interest finding. Of the nine *Holley* factors she

34

addresses in her brief, she concedes that two favor termination and maintains that the remaining seven factors are neutral. In a nutshell, she asserts that the evidence is not unfavorable enough as a whole to constitute clear-and-convincing evidence that the termination of her parental rights is in the best interest of ABG and DB.

The two factors the mother concedes weigh in favor of termination are the children's emotional and physical needs now and in the future and the emotional and physical danger to the children now and in the future. Given the evidence of child endangerment, we agree that these two factors support the best-interest finding. *See In re A.J.A.D.*, No. 01-22-00521-CV, 2022 WL 17813763, at *11 (Tex. App.—Houston [1st Dist.] Dec. 20, 2022, pet. denied) (mem. op.) (stating "evidence of child endangerment is especially relevant to an evaluation of a child's best interest"). Without repeating our prior analysis of the evidence as to child endangerment here, we observe that this evidence shows that these two *Holley* factors strongly weigh in favor of the best-interest finding. *See id.* (referring back to endangerment analysis).

Moreover, as we have observed in the past, evidence of child endangerment is particularly relevant to an evaluation of a child's best interest because evidence of child endangerment implicates several of the *Holley* factors. *Id.* In addition to the children's emotional and physical needs and the emotional and physical danger to the children, evidence of child endangerment bears on the parental abilities of the parents seeking to regain custody and the acts or omissions of these parents that may

indicate the existing parent–child relationship is not proper. *See id.* (holding that these factors "necessarily must take into account any evidence of child endangerment"). Accordingly, at least four of the *Holley* factors support the trial court's best-interest finding based on the evidence of child endangerment alone.

A fifth factor, the stability of the home, further supports the trial court's best-interest finding. ABG and DB were removed from the mother's care because of the instability of her home. Depending on which version of events the trial court credited, the family was either homeless or spending its days in an inoperable SUV after the mother and the father were evicted from an apartment they had leased due to multiple lease violations, including ones indicative of misbehavior, like unauthorized occupants, excessive noise complaints, and strong marijuana odor.

There is some evidence indicating the mother's home has stabilized in part. She once again resides in an apartment, cares for another child who was born during the pendency of this suit, and has completed a course to gain parenting skills.

But there is also ample evidence from which a factfinder could reasonably find the mother's home remains unstable. The trial court heard undisputed evidence that the mother had received multiple eviction notices as to her current apartment and that peace officers were dispatched to her apartment multiple times. It likewise is undisputed that the mother will not continue living at this complex when her current lease ends, and the mother has not yet secured a new residence, something

she may be unable to do given the uncertainty associated with her job and her apparent inability to document or otherwise verify her income. In her appellate brief, the mother frankly concedes that she "is still struggling with housing stability."

When, as here, the evidence reasonably allows a factfinder to find that a parent has been unable to provide children with a stable home in the past and continues to struggle to maintain a stable home in the present, the *Holley* factor concerning the stability of the home will support the factfinder's determination that termination of parental rights is in the children's best interest. *See In re A.C.*, 394 S.W.3d 633, 643 (Tex. App.—Houston [1st Dist.] 2012, no pet.) (taking into account evidence that parents "were homeless or living out of a motel" in assessing stability of home).

Furthermore, the trial court was entitled to credit the testimony—from multiple witnesses—that the mother was dishonest with the Department and others to such an extent that it made it impossible to work with her to reunite the family. The mother herself acknowledged misleading the Department and her therapist about the birth of her seventh child for a time during the pendency of this suit. And while the evidence was disputed as to some other alleged instances of dishonesty, the trial court sitting as factfinder was entitled to disbelieve the mother's account and conclude that she had, for example, misled the Department about such fundamental matters as whether she and the father continue to live together. As

explained by Gibson, the caseworker, the mother's dishonesty made it impossible to know what was actually happening or to assist the mother to regain custody.

As our sister court has observed, parental "dishonesty is not in a child's best interest." *In re I.M.T.*, No. 14-15-00869-CV, 2016 WL 1392107, at *3 (Tex. App.—Houston [14th Dist.] Apr. 7, 2016, no pet.) (mem. op.). When, as here, the evidence permits a factfinder to reasonably conclude that a parent has misled the Department or others about his or her homelife or living circumstances, the parent's dishonesty may support an adverse best-interest finding. *See, e.g.*, *In re S.K.*, 198 S.W.3d 899, 908 (Tex. App.—Dallas 2006, pet. denied) (taking into account mother's dishonesty "about her employment and living circumstances" in affirming trial court's finding that termination of mother's parental rights was in her children's best interest).

In this case, the mother's dishonesty implicates at least two other *Holley* factors: the programs available to assist her to promote her children's best interest and her plans for the children should they be returned to her care. Her dishonesty implicates these factors because evidence of dishonesty so significant as to hinder the Department from working with her to rectify the issues prompting removal indicates that she cannot benefit from any available programs that could assist her in promoting her children's best interest and that any trust placed in her ostensible future plans for her children would be misplaced. *See, e.g.*, *In re P.P.-S.*, No. 02-23-00309-CV, 2024 WL 123654, at *8 (Tex. App.—Fort Worth Jan. 11, 2024, no pet.)

(mem. op.) (considering fact that mother's dishonesty prevented her from completing individual counseling and concluding *Holley* factor as to whether she would benefit from programs that could assist her supported best-interest finding); *In re G.C.*, No. 13-20-00566-CV, 2021 WL 1916473, at \*7 (Tex. App.—Corpus Christi May 13, 2021, no pet.) (mem. op.) (taking into account father's dishonesty in assessing his ostensible plans to protect children and meet their needs and concluding *Holley* factor as to plans for children supported best-interest finding).

Here, the mother's failure to complete her court-ordered service plan reinforces the impression that she would not benefit from programs that could assist her in promoting her children's best interest and that any plans she has for her children are not to be credited. Notably, the mother was initially discharged from individual counseling for missed appointments. Though she began attending counseling again afterward, Gibson testified that the mother's dishonesty called into question whether the mother could successfully complete counseling in the end. Evidence of this sort, which shows a failure to benefit from the programs available to secure the return of one's children, indicates that the parent will not make effective use of these programs in the future or realize any corresponding future plans. *See, e.g.*, *In re J.M.T.*, 519 S.W.3d at 269–70 (holding that father's failure to complete family service plan supported best-interest finding, including under *Holley* factor regarding programs available to assist father to promote child's best interest).

Hence, contrary to the mother's argument on appeal, we hold that seven of the nine *Holley* factors unambiguously support the trial court's finding that the termination of the mother's parental rights is in the best interest of ABG and DB.

Nevertheless, the mother argues that termination of her parental rights is premature at this juncture. In support of this argument, she relies on undisputed evidence that she has consistently visited ABG and DB during the pendency of this suit and her visits with the children have been appropriate. As Peters, the current child advocate, acknowledged on the stand, the mother clearly loves the children.

This evidence is significant. It shows that the mother is not indifferent to ABG and DB, and this circumstance is some evidence weighing against the termination of her parental rights in this case. However, given the record as a whole, we cannot say that legally or factually insufficient evidence supports the trial court's finding that termination of the mother's parental rights is in her children's best interest. This is so because the evidence as a whole shows that no matter how sincere the mother's love for ABG and DB might be, her parental shortcomings and the instability of her home compromise her ability to care for these two children. *See In re E.D.*, 682 S.W.3d 595, 610 (Tex. App.—Houston [1st Dist.] 2023, pet. denied) (acknowledging mother consistently visited and was bonded with child but holding evidence nonetheless was sufficient to support termination because record as whole showed her sincere desire to care for her child was compromised by drug use).

If the record included evidence of significant progress by the mother in addressing and rectifying the parental failings that led to the children's removal, termination might well be premature. But the trial court heard evidence from which it could have reasonably found this was not the case, including evidence that the mother failed to satisfy her court-ordered family service plan and had not established stable employment or stable housing. The children's "need for certainty and permanence, including the establishment of a stable home and familial relationships, is the paramount consideration in a best-interest decision." *In re A.J.D.-J.*, 667 S.W.3d at 834. To this end, we must factor into our analysis "the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time." FAM. § 263.307(b)(11). Here, the evidence does not show the mother has made these necessary changes within a reasonable time.

On this record, the mother's argument that the trial court should have refrained from terminating her parental rights amounts to a plea to keep her two very young and vulnerable children in limbo indefinitely. When, as here, the evidence does not show there is a realistic prospect that a parent will be able to provide his or her children with a safe and stable home within a reasonable amount of time, the trial court need not, indeed should not, opt for a disposition less severe than termination in the hope that the parent will rise to the occasion at some point in the future. *See*

*In re M.S.*, 115 S.W.3d at 548 (stating child has interest in rendition of final decision so that adoption to stable home or return to parents is not unduly prolonged).

In conclusion, viewing all the evidence in the light most favorable to the trial court's best-interest finding and considering undisputed contrary evidence, we hold the trial court could have reasonably formed a firm belief or conviction that termination of the mother's parental rights is in the best interest of ABG and DB. Therefore, the evidence is legally sufficient to support the best-interest finding.

Furthermore, in view of the entire record, we hold the disputed evidence the trial court could not have reasonably credited in favor of the best-interest finding is not so significant that the trial court could not have formed a firm belief or conviction that termination of the mother's parental rights is in the best interest of ABG and DB. Thus, the evidence is factually sufficient to support the best-interest finding.

### *Sole Managing Conservatorship*

The mother argues that the trial court abused its discretion by appointing the Department as sole managing conservator of ABG and DB. But because we have rejected the mother's challenges to the trial court's decree terminating her parental rights as to these children, she lacks standing to contest this appointment. *See In re R.J.*, 579 S.W.3d at 120 (explaining that parent lacks standing to contest appointment of conservator when court of appeals affirms decree terminating parent's rights).

## CONCLUSION

We affirm the trial court's decree.

Gordon Goodman
Justice

Panel consists of Justices Goodman, Landau, and Countiss.